[No. A064761. First Dist., Div. Three. Sept. 18, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCOS ORTIZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

**COUNSEL**

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Clifford K. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PARRILLI, J.**—Marcos Ortiz appeals following a jury conviction of second degree murder with a knife.[1] He contends the trial court committed *Wheeler*[2] error and erroneously admitted statements made by the victim, Evelia Juarez. Appellant claims admission of the victim's statements violated *People* v. *Hamilton* (1961) 55 Cal.2d 881 [362 P.2d 473] (*Hamilton*) (revd. on other grounds in *People* v. *Wilson* (1969) 1 Cal.3d 431, 443 [82 Cal.Rptr.2d 494, 462 P.2d 22]). In an unpublished portion of this opinion we conclude that no *Wheeler* error occurred. In the published portion, we conclude that the rule of *Hamilton* has been abrogated by the adoption of the Evidence Code and constitutional amendment. We affirm the judgment.

### FACTS

Following a 1989 trip to Mexico, Evelia and Albino Juarez returned to California with appellant, their 20-year-old nephew. Appellant initially lived with the Juarez couple and their young son in a one-bedroom apartment. Appellant slept in a sleeping bag in the living room. When the Juarez family moved to a house, appellant moved with them and lived in a basement studio.

In March 1992, six months before the killing, Evelia[3] telephoned her sister, Luz Maria Perez, and told her that while she was changing her clothes in her bedroom, appellant entered the room, tried to assault her and declared that he loved her.[4] Right after the telephone conversation Evelia went to her mother's house. When Evelia arrived, she was crying and very nervous. She said appellant had tried to take advantage of her; he had lifted up her skirt.

Evelia called Albino who left work and went to his mother-in-law's house. When he arrived, Evelia was crying and very upset. She told Albino appellant had tried to rape her. Albino observed scratches on her thighs. Evelia related that in attempting to get away from appellant she had scratched his face.

Albino immediately returned home and confronted appellant, who denied everything. When Albino inquired how he got scratches on his face,

---

[1]Penal Code sections 187 and 12022, subdivision (b).

[2]*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

[3]For ease of reading we will refer to the members of the Juarez family and other witnesses by first names.

[4]The record does not disclose how much time elapsed between the incident described by the victim and the telephone call to her sister.

appellant stated he had overheard Evelia talking to a man on the telephone. When he said he was going to tell Albino, Evelia got angry and scratched his face. Albino requested appellant move out. Appellant went to live with his brother Efrin that day but did not return the house keys for about a week. After his eviction, Evelia told her cousin Nancy Yset that she felt more comfortable with appellant not living in the house.

On September 1, 1992, the day before the killing, Albino made arrangements with appellant to help finish laying a linoleum floor in the Juarezes' kitchen the next day. They had previously spent a day working on the project together. On September 1 some of Albino's tools, including two hammers, were in the kitchen in anticipation of the work.

Also on September 1, Evelia spoke to Ramona Elenes, a friend from whom she had purchased jewelry. Evelia advised her friend to come to her home the following day between 9 a.m. and noon to pick up payment for the jewelry.

On September 2, 1992, Albino left for work at 7:30 a.m. while his wife was still asleep. At 8:30, Evelia took their son to school where she met her sister, Luz. Evelia invited her sister to her house, but Luz had to go to work. As Evelia was driving home, she saw her cousin, Nancy Yset, walking down the street. Ms. Yset was on her way to work. Evelia gave her a lift and invited her to come over whenever she had time.

Albino called home between 10 and 10:30 a.m. to arrange to pick up their son on his way home from work. There was no answer. At 4 p.m. he telephoned Evelia at Las Comadres, a restaurant where she worked the 4 to 10 p.m. shift. She was not there. Albino also called his mother-in-law's residence, but there was no answer. Concerned about his son, Albino left work early and drove to his mother-in-law's apartment.[5] Nobody was there.

Albino then picked up appellant at appellant's apartment so they could go to work on the kitchen floor. The two men drove to the Juarez home in Albino's truck. Appellant appeared normal but was silent when Albino told him he could not locate his wife.

---

[5]Albino was unaware that his son had been picked up by his sister-in-law.

Arriving home, Albino noticed Evelia's parked Blazer. He rang the front door bell but got no response. He unlocked the front doors[6] and entered the living room. Albino immediately knew something was wrong. Although Evelia was normally very neat, there was a dirty cereal bowl in the living room and the beds were unmade. Albino found blood on the floor in the kitchen, and discovered the body of his dead wife in the bathroom. She was nude below the waist.

Albino ordered appellant to call 911, but the kitchen phone was off the wall. Albino then found that neither of the phones in the bedroom worked. He ran out of the house to get help.

An autopsy on Evelia's body was performed the following day. The pathologist found multiple bruises to the victim's face, neck, legs, buttocks, back and arms. These bruises were made with a blunt instrument. There were also two fractures to the skull, which had caused bleeding to the surface of the brain. The fractures, which were potentially lethal, could have been caused by a hammer. It was unlikely they were caused by a fall. Evelia's throat had been cut five inches across the front of her neck, to a depth of two and one-half inches. There was one cut made from left to right, and another from right to left. Death may have occurred within three to five minutes after the carotid artery had been severed. Death was caused by the cut to the neck and multiple blunt injuries.

On February 17, 1993, appellant gave two contradictory statements to the police. Both of the statements were introduced in the prosecution's case-in-chief. Initially, he denied being in the Juarez residence on September 2, before he arrived with his uncle. He also denied ever having sexual relations with his aunt or killing her. At the end of the statement, the police told appellant they knew he was lying because a DNA test indicated that appellant had intercourse with his aunt on the day she was killed. They then left appellant alone for 12 minutes.

In his second statement, appellant admitted he had gone to the Juarez house that day at Evelia's invitation. He explained that Evelia had previously made sexual advances to him which he had rebuffed because she was his aunt. When he arrived at the Juarez house on September 2, Evelia answered the door with no clothes on from the waist down. She indicated she wanted to have sex. Although appellant told Evelia it was not right because she was his aunt, he finally agreed, and they had intercourse on the kitchen floor. After appellant ejaculated, Evelia wanted to have sex again, but appellant

---

[6]The entrance to the Juarez house had a screen door and a normal front door, both of which were double locked.

refused. Evelia objected to appellant having sex with other women, grabbed a knife and threatened to cut off his sexual organs. He pushed her hand away and Evelia stabbed herself in the neck. Evelia then fell backwards, hit her head against a chair, and fell to the floor. Appellant panicked, removed the knife from Evelia's throat, then dragged her to the bathroom. When the telephone started ringing, he disconnected the phones. Appellant then put on his pants and left.

*Defense*

Appellant testified at trial and, for the first time, claimed to have had a sexual relationship with his aunt before September 2, 1992. He stated he first had sex with Evelia the night of Albino's birthday party in 1991 when they were still living at the apartment. On the night of the party Evelia kissed him on the mouth. After the party, when Albino went to sleep, Evelia got into appellant's sleeping bag and had sex with him. Appellant was somewhat ashamed, because Evelia was his aunt. Appellant described another sexual encounter with Evelia after they had moved into the house.

In March 1992 appellant accidentally overheard Evelia making a date for the following Friday on the telephone. Realizing that appellant had heard her, Evelia threatened that if appellant said anything to Albino, he would be sorry. Appellant responded he would have to tell Albino because it was Albino's house. Appellant did not intend to tell his uncle that he, too, was involved with Evelia. Evelia tried to slap appellant, but he fended her off. Upset, Evelia started to cry. The phone rang and it was her sister. Evelia hung up the phone and left the house. Appellant denied trying to grab Evelia or scratching her legs.

Appellant testified to a version of the events of September 2 different from the one he gave to the police. At trial appellant added that Evelia admitted going out with other men who were better lovers than appellant. He also stated they got involved in a physical fight and they struck each other several times. He acknowledged he had struck Evelia with strong blows. Evelia calmed down for a moment, and appellant thought the fight was over. It was then that she went to the sink, grabbed a knife and moved it in a semicircular motion around his genitals. Frightened, appellant pushed her hand. Evelia swung in a circular motion to get away. She then lost her balance and fell. When appellant turned her over, the knife was in her neck. Appellant never intended to kill his aunt; he never had the knife in his hand, and her throat was cut accidentally. Appellant testified that he did not admit in his earlier statements that he had had sex before September 2 with Evelia because he was ashamed.

## DISCUSSION

### I. *Prosecutor's Exercise of Peremptory Challenges**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. *Statements by Evelia*

 Through a motion *in limine* the prosecutor sought to introduce testimony concerning statements made by Evelia. First, there were invitations extended to Luz Perez, Nancy Yset and Ramona Elenes to visit Evelia on September 2.[14] Second, there were statements to the effect that Evelia disliked appellant. Evelia told her sister, Luz, that she was fed up with having appellant live in her house because he was "always bothering her." Third, there were statements that appellant spied on her in the bathroom and entered the bathroom when she was showering. Evelia told Luz and Nancy that when she took baths, appellant would make panting noises outside the bathroom door. Evelia told Ramona he had intruded on her when she was in the shower. Additionally, Evelia claimed that appellant had sexually assaulted her: (1) six months before her death Evelia told Luz that when she was in her bedroom changing clothes, appellant tried to grab her; (2) she told Nancy appellant had tried to take advantage of her in her bedroom; he had lifted up her skirt; and (3) she told Albino appellant had tried to rape her. These were three descriptions of one incident, not three separate events.[15]

The prosecution offered multiple theories of admissibility for the statements. The People sought to present these statements pursuant to Evidence Code[16] section 1250 and as nonhearsay circumstantial evidence of the victim's state of mind. The statements were offered to rebut appellant's claim that Evelia had invited him to her house on the day of the incident and willingly engaged in sex. Appellant opposed the motion on the grounds the statements were not trustworthy (§ 1252) and they were more prejudicial than probative because they involved prior bad acts. (§ 352.) The court ruled that the statements were probative to show the victim's state of mind as to whether she would have sex with appellant voluntarily; except for the statement which indicated appellant attempted to rape Evelia, they were

---

*See footnote, *ante*, page 377.)

[14]Although the prosecutor offered to prove that Evelia had invited Nancy Yset over on the morning of the killing, the witness did not testify the victim invited her over that day.

[15]At oral argument, appellate counsel clarified that appellant's claim of error applied only to the third class of statements—those which described past conduct of appellant. At trial, appellant objected to all three classes of statements. We discuss all three in order to explicate our ruling.

[16]All further statutory references are to the Evidence Code unless otherwise indicated.

more probative than prejudicial. As to any description of an attempted rape, the court ruled that section 352 precluded admission. It further found the statements admissible under section 1250, subdivision (a)(1) and (2). Relying on *Hamilton*, appellant contends it was error to admit this evidence. (*Hamilton, supra*, 55 Cal.2d 881.)

■ The trial court is vested with broad discretion in determining the admissibility of evidence. (*People* v. *Karis* (1988) 46 Cal.3d 612, 637 [250 Cal.Rptr. 659, 758 P.2d 1189].) This is particularly true where, as here, underlying that determination are questions of relevancy, the state of mind exception to the hearsay rule and undue prejudice. (*People* v. *Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].) The lower court's determination will be reversed only upon a finding of abuse. (*People* v. *Edwards* (1991) 54 Cal.3d 787, 820 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Karis, supra*, at p. 637.)

In *Hamilton*, decided before the enactment of the Evidence Code, the defendant was charged with and convicted of the first degree murder of his ex-wife and her boyfriend. The defendant claimed he and his former wife were on friendly terms and on the night of the murder she had asked him to come to her house. The trial court permitted the prosecution to introduce, in rebuttal, the wife's statements that she was afraid of defendant, that he had threatened her with death on many occasions, beaten her, kidnapped her, and sexually assaulted her. Over a hearsay objection, the trial court admitted the evidence for a nonhearsay purpose; i.e., as circumstantial evidence that the ex-wife was not friendly with the defendant, and "that her 'state of mind' was such as to cast doubt on defendant's testimony." (55 Cal.2d at p. 889.) Although the trial court gave repeated admonitions that the evidence was being admitted for the limited purpose of showing the victim's state of mind, the prosecutor repeatedly argued the truth of the decedent's statements as though they had been established. (*Id.* at pp. 898-899.)

The Supreme Court reversed the conviction, holding that declarations of a victim to show state of mind are inadmissible if they refer "solely to alleged past conduct on the part of the accused." (*Hamilton, supra*, 55 Cal.2d at pp. 893-894.) The Supreme Court concluded the statements *were* hearsay and that any attempt to limit the jury's use of such evidence would be futile. The court reasoned the trier of fact would be unable to follow the limiting instruction; a layperson would believe the declarant could only have the state of mind argued to exist if the content of the statements were true. (*Id.* at p. 896.) Significantly, the prosecutor in *Hamilton*, in both opening statement and closing argument, repeatedly referred to the victim's statements as having proved the matters asserted therein. (*Id.* at pp. 899-900.)

■ The People argue that the enactment of the Evidence Code four years after *Hamilton*, and the amendment to the California Constitution adding article I, section 28, subdivision (d), the popularly designated "Truth-in-Evidence" provision, impugn the vitality of that decision. No case cited by the parties, nor discovered by the court, has addressed this question. However, several later cases cite and appear to rely upon or distinguish *Hamilton*. (See *People* v. *Deeney* (1983) 145 Cal.App.3d 647, 652-654 [193 Cal.Rptr. 608]; *People* v. *Coleman* (1985) 38 Cal.3d 69, 81-86 [211 Cal.Rptr. 102, 695 P.2d 189]; *People* v. *Howard* (1988) 44 Cal.3d 375, 404 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 104 [246 Cal.Rptr. 245, 753 P.2d 37]; and *People* v. *Milner* (1988) 45 Cal.3d 227, 249 [246 Cal.Rptr. 713, 753 P.2d 669].) The Supreme Court has never questioned the reasoning of *Hamilton*. Nor has it been called upon to address *Hamilton's* vitality in the wake of article I, section 28, subdivision (d) of the California Constitution. Indeed, the Supreme Court cases citing *Hamilton* since the enactment of the Truth-in-Evidence provision (see above) all dealt with crimes which preceded that enactment. The Supreme Court has held that the Truth-in-Evidence provision has only prospective application. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].)

Appellant contends *Hamilton* remains good law by which lower courts are bound. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) We conclude otherwise for two reasons. First, four years after *Hamilton*, the Legislature enacted the Evidence Code. The code is governed by a general rule of inclusion: "Except as otherwise provided by statute, all relevant evidence is admissible." (§ 351.) Section 1200, the principal hearsay provision, makes out-of-court statements inadmissible when they are offered to prove the truth of the matter stated. Thereafter, the code provides multiple exceptions to this rule of exclusion. Specifically, sections 1250, 1251, and 1252 provide for admissibility of certain evidence offered to prove the state of mind of the declarant.

The Law Revision Commission Comments accompanying the new code sections make clear the code's repudiation of the *Hamilton* rule: "Statements of a decedent's then existing fear—i.e., his state of mind—may be offered under Section 1250, as under existing law, either to prove that fear when it is itself in issue or to prove or explain the decedent's subsequent conduct. Statements of a decedent narrating threats or *brutal conduct by some other person* may also be used as circumstantial evidence of the decedent's fear—his state of mind—when that fear is itself in issue or when it is relevant to prove or explain the decedent's subsequent conduct; and, for that purpose, the evidence is not subject to a hearsay objection because it is not offered to prove the truth of the matter stated." (Cal. Law Revision Com.

com., Deering's Ann. Evid. Code (1986 ed.) § 1250, p. 412, italics added.) "[The *Hamilton*] limitations on the admissibility of state of mind evidence are not mentioned in the Evidence Code for two reasons. First, they are confusing and contradictory: The declarations are inadmissible if they refer to past conduct of the accused; nevertheless, they are admissible 'only' when they refer to his past conduct, i.e., his threats. The declarations, to be admissible, must show primarily the state of mind of the declarant and not the state of mind of the accused; nevertheless, such declarations are admissible 'only' if they refer to the accused's statements of his state of mind, i.e., his intent to do future harm to the victim. [¶] Second, these additional limitations are unnecessary. Section 1200 makes it clear that statements of past events cannot be used to prove those events unless they fall within an exception to the hearsay rule; and Sections 1250 and 1251 make it clear that statements of a declarant's past state of mind may be used to prove only that state of mind and no other fact. . . . Evidence Code Section 352 provides the judge with ample power to exclude evidence of this sort where its prejudicial effect outweighs its probative value. But, under Section 352, the judge must weigh the need for the evidence against the danger of its misuse in each case. The Evidence Code does not freeze the courts to the arbitrary and contradictory standards mentioned in the Hamilton case for determining when prejudicial effect outweighs probative value." (Cal. Law Revision Com. com., Deering's Ann. Evid. Code, *supra*, § 1252, p. 420.)

The second reason we conclude *Hamilton* no longer controls is that 21 years after *Hamilton*, the people of this state enacted the Truth-in-Evidence provision, amending their Constitution to provide in pertinent part that all *"relevant evidence shall not be excluded in any criminal proceeding, . . .* Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, . . ." (Cal. Const., art. I, § 28, subd. (d), italics added.) *Hamilton* created a rule of exclusion: all statements of a deceased victim were inadmissible to show the victim's state of mind, even if that state of mind was in issue, if the statement referred solely to past conduct of the accused. (55 Cal.2d at pp. 893-894.) Because judicially created rules of exclusion were abrogated by the Truth-in-Evidence provision (see *In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744]), to the extent *Hamilton* mandates a judicially created rule of exclusion, it is no longer the law. Thus, under current authority, the court must be guided by the Evidence Code sections governing hearsay, section 352, and article I, section 28, subdivision (d) of the Constitution, when addressing the admissibility of statements

attributed to a deceased victim.[17] Further, to be admissible, the evidence must not violate constitutional provisions ensuring a fair trial.

The People contend the evidence of Evelia's statements was admissible under section 1250 and as nonhearsay circumstantial evidence of her state of mind. It is important to clearly distinguish these two theories.

Section 1250 provides in relevant part that ". . . evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan . . .) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." The evidence admitted under section 1250 is hearsay; it describes a mental or physical condition, intent, plan, or motive and is received for the truth of the matter stated. (See 1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 735, p. 716.) If offered to prove the declarant's state of mind, the statement may be introduced without limitation, subject only to section 352. However, the declarant's state of mind must be at issue in the case. For instance, evidence of the victim's general fear or dislike of the appellant is not relevant unless the victim's state of mind has been placed in issue. (*People* v. *Noguera* (1992) 4 Cal.4th 599, 622 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind. (See 1 Witkin, *op. cit. supra,* at p. 716.) Again, such evidence must be relevant to be admissible—the declarant's state of mind must be in issue. (§ 210.) A limiting instruction is required with declarations used as circumstantial evidence of the declarant's mental state; that is, the declaration is not received for the truth of the matter stated and can only be used for the limited purpose for which it is offered. (§ 355.)

The threshold determination is whether the proffered statement is hearsay, i.e., whether it is being offered to prove the truth of its contents. (§ 1200.)

---

[17]Nothing in the truth-in-evidence clause of the California Constitution abrogates the inherent power of the trial court to exercise its discretion to exclude prejudicial evidence under section 352. (*People* v. *Castro* (1985) 38 Cal.3d 301, 306 [211 Cal.Rptr. 719, 696 P.2d 111].) Even where evidence may be relevant and otherwise admissible for a limited nonhearsay purpose, an opposing party may raise a section 352 objection. In the face of such objection the court must engage in the weighing process prescribed by that section.

The statement: "I am afraid of John," is hearsay if offered to prove that the declarant fears John. If the declarant's state of mind is relevant, the statement is admissible under section 1250. If a declarant says: "John is dangerous," the analysis becomes more difficult. If offered to prove John is dangerous, the statement is inadmissible hearsay. If, however, the statement is offered merely to prove the victim believed John to be dangerous, the statement is not offered for its truth (thus not hearsay) but merely as circumstantial evidence of the declarant's mental state. A similar result obtains when the statement describes conduct which the victim *believes* the appellant has engaged in. Examples include, "John keeps calling my house and hanging up when I answer," or "John keeps driving by my house at night, but when I get to the window, he's gone." The statement reflects a conclusion by the declarant which is manifestly unsupported by personal knowledge. However, if offered to prove the declarant's state of mind, the accuracy of the conclusion is irrelevant. If offered to prove a fearful state of mind of the declarant, what is important is not whether John actually engaged in the conduct, but that declarant *believes* he did. Certainly, there remains the question whether the declarant honestly believes John engaged in the reported conduct. However, a jury could find the declarant honestly believed John had engaged in the conduct without necessarily finding that John had, in fact, done so. A clear limiting instruction can, in large part, dispel prejudicial misuse of such evidence.

A greater difficulty arises when the statement, fully asserting personal knowledge as opposed to mere belief, describes a past act of the defendant. For instance, if a declarant says: "John has beaten me many times," the statement would be inadmissible to prove John committed the batteries. However, if the evidence is offered to prove the declarant feared John, and, as a result of this mental state would not have accompanied him, the statement only has the proffered evidentiary value if the declarant is truthful when describing the event. If the statement is a lie, it cannot constitute circumstantial evidence of fear. In this situation, it is more difficult to fashion, and more demanding to expect the jury will follow, a limiting instruction. The jury can only legitimately conclude the declarant feared John if the statement is truthful. However, the jury would have been instructed not to consider the statement itself as true, because it is not admitted for its truth, but only as circumstantial evidence of state of mind. The difficulty is compounded the more inflammatory the prior conduct.

■ With the distinction between circumstantial evidence and section 1250 in mind, we address the admissibility of Evelia's statements. First, Evelia's invitations to Luz and Ramona were admissible as nonhearsay circumstantial evidence; that is, the fact that she had made such invitations

tended to show Evelia had not asked appellant to come to her home on September 2 for a romantic liaison. Rather, the mere fact the invitations were made was relevant to demonstrate she planned to have visitors and did not act as appellant claims on the day of the killing. These statements made no reference to the appellant and were admissible.

Second, the statements to Luz that Evelia was "fed up" with appellant living in her house were classic examples of section 1250's exception to the hearsay rule. They were direct evidence of Evelia's attitude toward the appellant. The portion of the statements in which Evelia explains that she is "fed up" because appellant was "always bothering her" does refer to past conduct of appellant. However, the statement is vague and contains little prejudicial information, evidenced by appellate counsel's concession to the admissibility of this statement.

Third, the specific complaints regarding appellant's prior conduct, including heavy breathing outside the bathroom,[18] his intrusion into the bathroom while Evelia was showering, and the alleged sexual assault in March 1992,[19] described past acts attributed to appellant which, if they had been offered to prove that those events occurred, would have been inadmissible as hearsay. However, the statements were relevant circumstantial evidence of Evelia's unwillingness to have consensual sex with appellant particularly when considered with the witnesses' descriptions of Evelia's demeanor as she related these statements. If she were romantically involved with appellant, as he claimed, it would be inconsistent with her being upset over his sexual advances, as the testimony described.[20] These statements of past conduct of appellant were the type proscribed in *Hamilton*. *Hamilton* held that such evidence of appellant's past bad acts makes it impossible for the jury to separate the state of mind of the declarant from the truth of the facts contained in the declarations. For that reason, the statements in *Hamilton* were inadmissible. (55 Cal.2d at p. 895.) However, for the reasons discussed above, we hold that *Hamilton* is no longer dispositive on the admissibility of such evidence.

 Further, now that section 352 codifies a safeguard for the evaluation of such evidence before it can be admitted, the trial court has a

---

[18]This statement regarding activity outside a closed bathroom door was the type of statement that would be easiest for the jury to consider properly with a limiting instruction. No personal knowledge was asserted in the statement, and what the declarant believed is the critical feature of the statement as opposed to the accuracy of the information.

[19]We do not consider the People's argument that the evidence was admissible under section 1240 (spontaneous statement exception), as the record is insufficient to establish admissibility under that exception, nor was this theory advanced or considered below.

[20]Circumstances surrounding the making of the statement that suggest the declarant was not genuinely upset can be considered by the trial court in ruling on the admissibility of such evidence. If the evidence is admitted, the witnesses to whom the statement was made will be available for cross-examination on the subject.

mechanism for considering the potential for misuse on the unique facts and statements in each case. Where the statement is offered as relevant circumstantial evidence to the victim's state of mind, the court may consider such things as the prejudicial nature of the conduct attributed to appellant; the demeanor of the declarant as described by the witnesses and other circumstances attendant to the making of the statement; and whether the circumstances of the statement are such that the jury will be unable to follow the limiting instruction. If the court concludes that the jury will be unable to use the evidence solely within its limitations, the court should exercise its discretion and exclude the evidence. We do not mean to imply that statements of a decedent describing past conduct of the accused will always be admissible when the state of mind of the declarant is in issue. On the contrary, even though *Hamilton* no longer controls the question of admissibility, the concerns articulated in *Hamilton* are among the factors trial courts must consider in ruling on the evidence.

The question remains whether the statements, generally admissible under California law, are admissible in light of the Sixth Amendment right to confrontation guaranteed by the United States Constitution. Interestingly, the most famous case on this subject, *Shepard* v. *United States* (1933) 290 U.S. 96 [78 L.Ed. 196, 54 S.Ct. 22] (cited and relied upon by the Supreme Court in *Hamilton, supra,* 55 Cal.2d at pp. 896-897), mentions neither the Sixth Amendment nor the Constitution. There, the government sought to prove the appellant had murdered his wife by offering her statement, "Dr. Shepard has poisoned me." The statement was admitted as a dying declaration. However, the Supreme Court found the statement did not meet the criteria for that exception to the hearsay rule. (*Shepard* v. *United States, supra,* 290 U.S. at p. 99 [78 L.Ed. at p. 199].) The Court of Appeal upheld admission of the statement as evidence of the declarant's state of mind on the theory that it disproved Mrs. Shepard had committed suicide, a theory advanced by the defense. (*Id.* at p. 102 [78 L.Ed. at pp. 200-201].)

The Supreme Court pointed out that the statement had originally been received for its truth under the dying declaration exception and that the jury had never been instructed to receive the statement only for the more limited purpose: "[The government] did not use the declarations by Mrs. Shepard to prove her present thoughts and feelings, or even her thoughts and feelings in times past. It used the declarations as proof of an act committed by some one [*sic*] else, as evidence that she was dying of poison given by her husband. . . . It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one [*sic*] else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is

for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out. [Citation.]" (*Shepard* v. *United States, supra,* 290 U.S. at p. 104 [78 L.Ed. at pp. 201-202].)

This statement by the court in *Shepard* is problematic because (1) it was unnecessary to its holding, and (2) the authority for its position is unclear. Justice Cardozo did not purport to be interpreting a federal statute or the Constitution. Rather, he was addressing the common law hearsay rules as they are applied in federal courts.[21] We find nothing in *Shepard* to suggest it is precedent for our interpretation of California evidentiary rules or the United States Constitution. Notably, the Federal Rules of Evidence, passed in 1974, contain no *Shepard* provision in their treatment of hearsay. (Fed. Rules Evid., rule 801 et seq., 28 U.S.C.) That is, evidence of state of mind is admissible unless it is a statement of memory or belief offered to prove the fact or event remembered. (Fed. Rules Evid., rule 803(3), 28 U.S.C.) There is no separate requirement that the statement not refer to past conduct of the appellant. Instead, considerations of prejudice are addressed by a general rule similar to our own section 352. (Fed. Rules Evid., rule 403, 28 U.S.C.)

---

[21]However, the Supreme Court did reach constitutional grounds for its similar holding in *Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205]. There, the court held a defendant is constitutionally entitled to have the court first determine the voluntariness of his confession, rather than submitting that issue to the jury along with the question of the defendant's guilt. The court questioned the jury's ability to bifurcate those two issues. The same reasoning applied to the court's Sixth Amendment ruling in *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], where it was held a defendant was entitled to a separate trial when the prosecution utilized a statement of the codefendant incriminating to defendant: "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. . . . It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, as was recognized in *Jackson* v. *Denno, supra,* there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. [Citations.] Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." (*Bruton* v. *United States, supra,* at pp. 135-136 [20 L.Ed.2d at pp. 484-485].)

The case before us is distinguishable and does not mandate a blanket rule of exclusion. In *Jackson* v. *Denno, supra,* if the jury determined a statement was involuntary (despite other evidence of the defendant's guilt and, therefore, the truth of the statement), it was required to set the statement aside and determine the defendant's guilt without consideration of the statement. In *Bruton,* the jury was asked to accept the codefendant's statement as true but to disregard any reference therein to the defendant. In both *Jackson* and *Bruton,* the statements described the very crime under the jury's consideration. Here, the statements in question were not made by a defendant or his accomplice and do not pertain to the charged crime.

■ As previously stated, the trial court has broad latitude in applying section 352. The statute provides in relevant part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We must first reiterate that the prejudice contemplated by this rule is not merely evidence unfavorable to the appellant. Realistically, the majority of prosecution evidence will be unfavorable to the appellant. Rather, the rule contemplates " '. . . evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People* v. *Karis*, *supra*, 46 Cal.3d at p. 638.)

■ In the case at bench, the court conducted the requisite balancing of interests under section 352. We find no abuse of discretion in that ruling, nor did the admission of this evidence deprive appellant of a fair trial. As to the first class of statements, the invitations by the victim to her home, although they tended to disprove appellant's version of events, these statements were not prejudicial at all. They made no mention of appellant, and the jury could make no improper inference about appellant's past conduct or his character from them.

The statements that Evelia was "fed up" with appellant were highly probative of her attitude toward him and were made under circumstances supporting trustworthiness. The portion of the statement that explained *why* she was fed up (because he was "always bothering her") was a description of past conduct by appellant. The statement made no reference to specific acts and was not unduly prejudicial.

Finally, as to the third class of statements, which all referred to some prior conduct by appellant, the court properly determined these statements were probative of the victim's state of mind, which was at issue. The jury was instructed to consider the statements only as they tended to prove the victim's state of mind. The statements were made under circumstances indicating their trustworthiness. While obviously prejudicial to appellant (in the sense contemplated by section 352), this evidence was also highly probative of her attitude toward him. On balance, we cannot say the trial court abused its discretion in allowing these statements into evidence.[22]

---

[22]Albino testified at trial that Evelia stated the appellant "attempted to rape" her. Although the court had ruled that any use of the word "rape" would be excluded under section 352, no one at the time of the *in limine* motion expected the husband to use the word "rape." He had not used that word when describing his wife's statement during the preliminary hearing. The

At the conclusion of the motion *in limine*, the trial court admitted Evelia's statements as hearsay under section 1250, subdivision (a)(1) and (2),[23] rather than as statements not offered for the truth. However, when the evidence was admitted during the trial, the court correctly and repeatedly admonished the jury that the statements were admitted to show Evelia's state of mind only, not to prove whether the acts attributed to the appellant in the statement really happened. Appellant alleges both the judge and prosecutor referred to the evidence as establishing the truth of the content of the statements, illustrating the very problem *Hamilton* envisioned.

As to the alleged misstatement by the court, we cannot agree with appellant's characterization. Nancy Yset testified the victim told her appellant had been breathing heavily outside her bathroom door while she was taking a shower but that when she opened the door to confront him he was gone. On redirect examination, the prosecutor attempted to elicit from Nancy Yset whether the victim was sure it had been appellant outside the door. Upon a defense objection, the court commented, "The inference is the jury could draw that it was either Mr. Ortiz or some third party." The prosecutor next asked if the victim had told Yset how she knew it was appellant outside her door. The court sustained a defense objection, stating that question would go to the truth of the assertion and not the victim's state of mind. The fact that the victim believed appellant was breathing heavily outside her bathroom door was relevant as to her state of mind and whether she would willingly engage in sexual intercourse with him. However, why she believed it was appellant would only tend to prove or disprove the truth of the believed fact. The court properly sustained an objection to that question. In context, the court's comment about the inference to be drawn by the jury was not meant to suggest the jury could find appellant had committed the act. Rather, the court was suggesting that who committed the act was irrelevant.

---

defense then moved for a mistrial, which was denied. The court denied the motion concluding that the prejudice from the use of the word "rape" was minimal when the testimony was viewed in context. The defense had conceded a claim of sexual assault had been made by Evelia to others in its opening statement. Testimony about that subject was already before the jury. Appellant claimed these "slanders" were designed to cover up the affair he claimed existed. We also note the trial court concluded there was insufficient evidence for a felony murder theory based on rape or attempted rape; no instructions were given for that theory despite the prosecution's request.

[23]As we have noted, only those statements about Evelia being "fed up with" the appellant properly fell within section 1250, subdivision (a)(1).

The prosecutor, at one point in her closing argument, suggested that the truth of the content of one statement had been established. However, the prosecutor's comment was brief, especially in the context of a lengthy argument, and is clearly distinguishable from the repeated transgressions described in *Hamilton*.[24]

We hold it was not error to admit Evelia's statements for the reasons we · have set forth. However, even without these statements, we conclude that no different verdict would have obtained. As the trial judge remarked during sentencing, appellant's story was "patently unbelievable." First, appellant claimed that, on September 1, Evelia told him to come to her house the following day. Yet, there was evidence that Evelia asked both Ramona Elenes and her sister, Luz Perez, to come to her home on September 2. It was unlikely the victim would have invited company if she intended to have an intimate rendezvous with appellant. Second, appellant claimed that Evelia somehow stabbed *herself* in the neck when she fell on the kitchen floor. However, the pathologist testified the victim's throat had been cut in two directions. He also stated Evelia's head injuries could have been caused by a hammer; it was not likely they were caused by a fall. If the jury believed the pathologist's uncontroverted testimony, it was impossible that the victim's injuries occurred in the way appellant claimed. His version of the facts was inherently incredible and when considered with the other evidence, exclusive of the victim's statements, provided overwhelming evidence of guilt.

Finally, the court instructed the jury in accordance with CALJIC No. 2.09.[25] The jury is presumed to have followed the court's instructions. (*People* v. *Delgado* (1993) 5 Cal.4th 312, 331 [19 Cal.Rptr.2d 529, 851 P.2d 811].) Accordingly, we conclude beyond a reasonable doubt that the jury would not have reached a more favorable result in the absence of any claimed error. (*People* v. *Noguera, supra,* 4 Cal.4th at p. 623; *Chapman* v.

---

[24]The prosecutor presented her version of the events preceding the victim's death: "The defendant was in her house waiting for her when she came home. He had the keys to the house. We know that. He probably waited for her to take off her clothes as she was preparing to take a shower—*that would be consistent for him*—and that is when she first confronted him, and that would explain why her clothing was all balled up with her shoes in the corner of the bathroom." (Italics added.)

[25]The court stated: "Certain evidence was admitted for a limited purpose. [¶] You will remember I let in evidence about the state of mind [of] the victim in this case. Remember? [¶] At that time the—this evidence was admitted, you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. Do not consider such evidence for any purpose except the limited purpose to which it was admitted."

*California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)[26]

## DISPOSITION

The judgment is affirmed.

Chin, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied October 13, 1995, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 21, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[26]The California Supreme Court has applied different standards of review to this type of error. Compare *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1205 [249 Cal.Rptr. 71, 756 P.2d 795] and *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], which cite the less demanding reasonable-possibility standard. We have employed the more rigorous beyond-a-reasonable-doubt standard as any error in admitting the statements would be of federal constitutional dimension to the extent that confrontation clause or due process issues arise. It is our view that no constitutional violation occurs when the nonhearsay evidence is received and properly considered as circumstantial evidence on a relevant issue.