Filed 3/7/16  P. v. Chapman CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>CARL CHAPMAN,<br><br>　　　　Defendant and Appellant. | B257249 c/w B262234<br><br>(Los Angeles County<br>Super. Ct. No. SA073898) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County. James R. Dabney, Judge.  Affirmed.

　　　　David Andrew Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Carl Chapman shot and killed his adult son, Brian. He was charged with murder. His sole defense was that he shot Brian in defense of himself and his girlfriend, Raquel Perry, because Brian had come after defendant and Perry with a mallet. The jury rejected defendant's defense, and concluded that the killing was premeditated first degree murder. The jury also found true a financial gain special circumstance allegation. Defendant appeals, raising instructional and evidentiary errors. We affirm.

## FACTS

It is undisputed that, on Friday, March 2, 2007, defendant shot and killed Brian in what had been the family home. When police arrived, Brian's body was discovered with a mallet in his hand. The prosecution's theory was that defendant had planted the mallet, and had intentionally killed Brian in order to secure ownership of the family home, which defendant's deceased wife had left to Brian. Defendant's theory was that Brian was a mentally-unhinged psychopath who had, just hours earlier, threatened violence against Perry if she did not leave the house.

1.  *The Chapman Family and Judy's Will*

The background facts were these. Defendant, an attorney, had been married to his wife, Judy, for 35 years. They had two sons: Brian, born in 1974, and Cary, two years younger. For many years, Brian had emotional issues and abused drugs. In December 2004 and again in January 2005, Brian checked himself into the mental health unit of Glendale Memorial Hospital. The hospital records show a primary diagnosis of severe depression and a secondary diagnosis of drug dependence. Thereafter, Brian appeared to have turned his life around: he had enrolled in college and began a two-year period of sobriety that was cut short by his March 2007 death.

Meanwhile, Judy had died in January 2006. Defendant and Judy had been legally separated at the time. Pursuant to Judy's July 2005 will, her personal property was to be equally divided between Brian and Cary. Although Cary received some interest in another piece of real estate, ownership of the family home, as well as all of the money in

2

Judy's bank accounts, was to go solely to Brian.[1]  Defendant was left nothing but Judy's best wishes.  Brian was appointed executor, but he left the day to day handling of the estate and the family home to defendant.  While the record is not entirely clear as to whether defendant was living in the family home at the time of Judy's death, defendant took up residence there after she passed.  Brian had his own apartment.

In February 2006, defendant, Brian, and Cary together met with Attorney Charles Shultz and sought his assistance in probating Judy's estate.  When Shultz asked if any of them wished to challenge Judy's will, they all agreed that the will properly set forth her wishes for disposition of her property.  They also agreed that, although Brian was the named executor, Shultz should communicate with defendant on estate matters.

2.      *Brian's Concerns Over Defendant's Handling of the Estate*

Over the following year, defendant was not forthcoming with Shultz.  Shultz repeatedly asked defendant for valuations of Judy's personal property; defendant did not comply.  At trial, defendant admitted that he never gave Shultz the estate inventory Shultz had repeatedly requested.

By March 2007, Brian came to believe that defendant had not made two monthly mortgage payments on the house.  Brian was afraid that the bank would foreclose and he would lose the house.  He was also concerned that if mortgage payments were behind, perhaps other estate expenses were not being paid as well.  Brian was worried that defendant might be financially mismanaging the estate.  By this time, Raquel Perry had come into defendant's life, and had become a frequent visitor at the house.  It is fair to say that neither Brian nor Cary liked Perry very much.  Brian thought that Perry had introduced defendant to drug use and was essentially living off defendant.  To at least some degree, Brian's concerns were well founded.  Defendant told a friend that Perry had introduced him to cocaine, and he admitted at trial that it was his drug of choice during 2006 and 2007.  While defendant adamantly denied spending any money from Judy's

---

[1]      Brian was to hold $35,000 in trust for Cary, which Cary would receive if he remained "clean and sober for one year" after Judy's death.

estate on Perry, he admitted that he took Perry on a trip to Las Vegas and also wrote her a check for $7,500. Defendant also told a friend that he had loaned Perry $9,000 and spent $2,500 on a Yorkie for her. On February 3, 2007, defendant asked his friend, Ira Candib, to loan him $15,000, as he needed financial assistance in paying expenses for the estate.

3.      *Brian's Decision to Confront Defendant About the Estate*

Brian discussed his concerns regarding the handling of the estate with several people, including Candib. On March 1, 2007 – the day before defendant killed Brian – Candib spoke with defendant and told him that Brian was concerned that defendant was not handling Judy's estate properly and Brian was going to get someone else to manage the estate. Defendant said that he could handle the estate himself and did not need anyone else involved. Later that day, Brian spoke with his boyfriend, Simon Ryan, and discussed their plans for March 2nd. Brian was going to the dentist's office in the afternoon, and he would then pick up Ryan and they would both go to an Alcoholics Anonymous meeting at 7:00 p.m.

Several witnesses helped to create a rough timeline of Brian's actions on the day of the murder. Between 11:00 a.m. and noon, Brian went to the office of one of his teachers at Loyola Marymount University, Sister Mary Ingham. He asked her for advice on whether he should try to reason with his father. He wanted to know if he should go see defendant that afternoon and talk to him about the way he was spending money on drugs and alcohol. Brian told Sister Ingham that he was afraid of defendant because his behavior was unpredictable. Brian spoke with Sister Ingham for 15 to 20 minutes. When he left, he still appeared worried, but his demeanor was grateful and serious. Brian also telephoned Father William Fulco, his academic advisor. He left a phone message for Father Fulco stating that he had to go to the dentist but that he planned to stop by his father's house to talk to him about finances. According to Father Fulco, Brian did not sound angry in the message. Brian had stated that he was becoming more distressed about the financial matters, but thought he could reason with defendant.

Phone records reflect that at 1:05 p.m. on the afternoon of the murder, Brian phoned Attorney Shultz and they spoke for 11 minutes. In that phone call, Shultz told

4

Brian that the estate could be settled without defendant's participation. Shultz and Brian agreed to meet on the following Monday to move forward without defendant. Phone records indicate that right after Brian got off the phone with Shultz, Brian unsuccessfully tried to phone defendant four times. The phone records show that between 1:05 p.m. and 2:20 p.m. defendant and Brian spoke briefly a couple times, and texted each other as well.

Between 3:15 and 4:00, Brian was at the dentist. A crown was placed; Brian was not medicated for the procedure. Brian unsuccessfully phoned defendant at 4:02.

4. *Brian Arrives at the House and Defendant Kills Him*

Shortly before 5:00 p.m., less than an hour after he left the dentist's office, a neighbor saw Brian parked across the street from the Chapman family home. Brian was standing outside his car. Brian then crossed the street and entered the home through the side door that opened into the kitchen/laundry area of the house. According to the neighbor, Brian had nothing in his hand, and did not look angry.

Esperanza Roldan, the Chapmans' housekeeper, was in the house.[2] Brian asked for defendant; Roldan said he had left. Brian waited, and Roldan returned to cleaning.

Defendant and his girlfriend came back to the house a short time later. Defendant and Brian argued; a witness heard loud arguing from across the street at around 5:00 p.m. Thereafter, gunshots were heard.

It is undisputed that defendant fired several shots, followed by a brief pause, followed by more shots. However, the witnesses disagree on how many shots were in each volley. Defendant took the position, consistent with the physical evidence, that he had fired three nonfatal shots at Brian in other rooms of the house, before firing the final two fatal shots at Brian in the laundry area just off the kitchen. A 911 call was made at 5:03 p.m. Roldan and Perry fled the house almost immediately. Defendant was left

---

[2] Although the jury was free to credit Roldan's testimony even in the face of inconsistencies, our recitation of Roldan's view of the events is limited to those portions that remained constant from the date of the killing to trial.

5

alone with Brian's body for several minutes. He did not leave the house until the police had arrived and began making a plan to effect entry. He cooperated with arresting officers.

5.  *Brian's Body and Suspicious Evidence of Self-Defense*

When police entered the house, they discovered Brian's dead body lying in the laundry area. A mallet was in his right hand. A pink towel, with various bloodstains, had been dropped on his hand. An open bottle of cleaning fluid was also near the body. Trial Exhibit 3 shows that Brian fell with his jacket open; the bottle of cleaning fluid was tipped over and partially *on the jacket*, giving rise to the inference that it, like the towel, was brought to its location *after* Brian fell. A reasonable jury could certainly infer that defendant placed the mallet in Brian's hand, and used the towel and cleaning fluid to wipe defendant's own fingerprints off the mallet.[3]

Other evidence suggested defendant had placed the mallet in Brian's hand. Roldan testified that she saw Brian on the laundry room floor before she ran out of the house; he had nothing in his hand. When arrested, defendant had Brian's cell phone in his possession, which presumably he took from Brian's body. Finally, Senior Deputy Medical Examiner Doctor Raffi Djabourian testified that, due to the nature of the most serious of Brian's gunshot injuries, Brian would have lost all neurological capabilities and would have dropped anything he had been tightly holding as he fell. Defendant cross-examined Dr. Djabourian on this point, eliciting an admission that, in about 20 percent of cases in which a person shoots him- or herself in the head, the person will still have the gun "in their hand or near their hand." It was the jury's function to assess the significance of Dr. Djabourian's testimony. His direct testimony supported the prosecution's argument that the mallet had been planted.

---

**3**      Prints were taken from the handle of the mallet. They did not match defendant. Forensic specialists were not able to match the prints to Brian because the palm print obtained from Brian's corpse was inadequate for matching. As the mallet was discovered in Brian's hand, his prints would be expected to be on the mallet. The issue was whether Brian or defendant had put the mallet in Brian's hand.

6

The cause of Brian's death was multiple gunshot wounds. Two shots to the head were fatal; one, which entered at Brian's left ear and exited at his right temple, would have killed him within seconds. A third shot, to his left flank, was potentially fatal, but survivable with treatment. The fourth and fifth shots were graze wounds to Brian's chin and shoulder. A toxicology screen showed no drugs in Brian's system.

6.      *Defense – Brian's Threats and Character for Violence*

Defendant asserted both self-defense and defense of others, specifically Perry. At first, defendant chose not to testify. His principal witness was Michael Peck, Ph.D., a clinical psychologist. Brian had been Peck's patient for many years but Peck had not seen Brian since 2001 or 2002. They had spoken on the phone since then. Peck had reviewed some, but not all, of the files from Brian's hospitalizations at Glendale Memorial's mental health unit. Peck testified that, both while he was treating Brian and when Brian was hospitalized, Brian had made threats to kill his parents, although Brian never stated a specific plan to do so. Peck expressed his opinion that Brian was "a violent person, not hesitating to inflict physical harm on other people if, in his opinion, they stood in his way, that they were interfering with his needs." He supported this opinion with various examples of Brian having committed unnecessary and unprovoked acts of explosive violence. He also testified that he knew Brian had used heroin and cocaine, and that he considered Brian to be "a psychopath," who had no sense of conscience or guilt about lying.

After defendant rested without testifying, the court and counsel discussed jury instructions. The trial court concluded that while there was barely enough evidence to justify a self-defense instruction, there was insufficient evidence to require instruction on defense of others. The next day, the court permitted defense counsel to reopen so that defendant could testify.

Defendant testified to Brian's ongoing mental health and drug abuse issues. He also testified to prior incidents of Brian's violence, both inside and outside the family.

7

7.      *Defense – Self-Defense Scenario*

Before we recite defendant's testimony of the events leading up to the shooting and the shooting itself, we observe that none of defendant's testimony was corroborated by anyone. The prosecution had been unable to locate Perry; defendant did not call her as a witness; and neither party sought to introduce any of her prior testimony. Brian's brother Cary, who, in defendant's view, played a part in some of the events leading up to the shooting, and witnessed others, also was not called to testify. In short, with the exception of evidence regarding Brian's prior mental health, drug, and violence issues, defendant's self-defense and defense of others theories were based entirely on the presence of the mallet and defendant's own testimony.

Defendant's account of the events leading up to the shooting began with Brian's unhappiness about Perry living in the family home. Nearly every day, Brian would call defendant and say he wanted "that [N-word] crack whore out of my mom's house, out of my mom's bed, not prancing around in front of my mom's ashes." Brian told defendant to get Perry out of the house or he would come get her and physically take her out. Brian was an imposing figure and weighed 250 pounds at the time. Defendant never actually saw Brian physically harm Perry, but he heard from others that Brian had done so. According to defendant, Brian told him that he had sneaked into the house one night, grabbed a sleeping Perry, dragged her from the house, and said, "Get the hell out of my mother's house. This is strike one. Next time strike two."

On the day of the shooting, the first time defendant saw Brian was at the bank. This occurred in the morning or around the noon hour. Defendant testified that they signed some refinance papers. No financial documents were introduced at trial.

When defendant and Brian left the bank, defendant had to run an errand, and Brian went ahead to the house; they would meet there. When defendant finally arrived at the house, he heard yelling. Defendant discovered Brian beating on the master bedroom door, which Cary had recently broken. According to defendant, Brian was yelling, "You fucking [N-word] crack whore, get the fuck out of this house." Defendant asked "what the hell [Brian] was doing." Brian said, "If you don't get that fucking [N-word] out of

8

here, I'm going to hit her." Defendant said he was not going to let Brian do that. As Brian was leaving the house, Brian turned back to Perry and said, "So that's strike two. The next strike you'll get the fuck out of here if I have to take you out." Brian also threatened defendant during his tirade.

At 1:30 p.m., police were called to the family home for a "female disturbance" and spoke with defendant. According to defendant, Cary had called the police and told them that Perry should not have been at the house. Defendant told the police everything was okay and did not mention that Brian had purportedly threatened to kill him and Perry, or had called "strike two."

Defendant did not see Brian again until Brian returned later that afternoon. Defendant's statements concerning Brian's return to the house and when defendant armed himself with a loaded gun were somewhat confused and contradictory. At trial, defendant testified that Brian came to the house while defendant was out. When defendant arrived, Brian threw a pawn ticket at him saying "This is strike three," and walked out of the house. According to defendant, Cary had stolen and was pawning his mother's jewelry and Brian was angry with defendant for not disclosing this to him. No pawn ticket was offered into evidence. While defendant was looking at the ticket, he heard the outside gate and door open. Realizing that Brian had come back and had now called "strike three," defendant grabbed his gun.

When questioned by police on the night of the killing, defendant's version was different. Defendant did not say Brian came to the house, gave him the pawn ticket, said it was strike three, then left and returned. Instead, defendant told police that Brian had phoned *an hour before* arriving and threatened that strike three was coming. That was why defendant armed himself; he also told Perry to stay behind a locked door in another room. Defendant adamantly told police that he would not have armed himself if Perry had not been in the house.

At trial, defendant testified that when Brian entered with the mallet, defendant's first intention was to scare Brian with the gun, which, at the time, did not have a bullet in the chamber. When Brian raised the mallet, defendant pulled the slide back on the semi-

9

automatic, and "accidentally fired the weapon."**4** Defendant fired two more shots, as he followed Brian around the house. Defendant thought Brian was moving toward the side door and would leave, but he did not. Instead, Brian remained in the laundry room and turned toward the dining room, where Perry was. At this point, defendant's gun jammed. He took the time to unjam the gun, and saw Brian standing with the mallet, "death waiting." Terrified for himself and Perry, defendant fired the two final shots, causing Brian to fall on the laundry room floor. Defendant picked up a towel and told Perry to call 911. Defendant felt physically sick and dropped the towel on Brian's hand. Defendant denied putting the mallet in Brian's hand or taking Brian's cell phone. He stated he only felt Brian for a pulse. He claimed the housekeeper had left the cleaning fluid on the floor.

When interviewed by police the night of the murder, defendant admitted that he had done a line of cocaine that morning; he confirmed this at trial.

### PROCEDURAL BACKGROUND

Defendant was charged by information with murder (Pen. Code, § 187, subd. (a)). The special circumstance of murder for financial gain was alleged (Pen. Code, § 190.2, subd. (a)(1)) as were various firearm enhancements (Pen. Code, § 12022.53, subds. (b), (c) & (d)).

Defendant pleaded not guilty and the case proceeded to jury trial. During deliberations, the jury submitted a question about the financial gain special circumstance. The jury asked, "Does the primary reason for the killing have to be for financial gain or can financial gain be only part of the reason the killing was carried out?" The court responded, in writing, that the financial gain did not have to be the primary reason and could be only part of the reason.

---

**4** Defendant did not tell police the first shot was accidental. Instead, he told police he thought that if he hit Brian "somewhere," Brian would realize that it hurt and leave the house; then defendant could call the police and it would all be over.

The jury found defendant guilty of first degree murder. The financial gain special circumstance and firearm allegations were found to be true. The jury was excused, and the jurors were told they could discuss the case with anyone.

Three months later, defendant moved for a new trial on several grounds. One of the grounds was that someone using the name "Lee" and identifying himself as a juror on the case had posted on an internet blog commemorating Brian. Although the timestamps on Lee's posts indicated that he had posted on the blog after the jurors had been excused, defendant argued the posts gave rise to the inference that Lee had also read the blog during the trial, and had seen prejudicial information other people had posted. The court concluded nothing in the blog posts indicated any misconduct on the part of Lee (assuming that he was, in fact, a juror). The new trial motion was denied.

Defendant was sentenced to life in prison without the possibility of parole for the special circumstance murder, consecutive to 25 years to life for the firearm enhancement. He filed a timely notice of appeal.

Four months later, while the appeal was pending, defendant filed a petition for access to confidential jury information. The motion was based on the same blog posts by presumed-juror Lee. Defendant argued that it was "reasonably likely" that Lee had viewed the blog during trial because he had posted on it "only a few hours after being discharged and was still active on the comment page several days after that posting." Defendant argued that the "close temporal proximity between the verdict and posting combined with Lee's involvement with the [blog] over time suggests he was aware of the blog before the verdict was rendered." Recognizing that it was too late to seek juror information for a possible motion for new trial, defendant argued that he needed the information to establish juror misconduct for a petition for habeas corpus. The court denied the motion on the basis that defendant had not established good cause necessary to trigger a hearing on the motion. Defendant filed a timely notice of appeal from the denial of the motion. We consolidated the two appeals.

11

## DISCUSSION

On appeal, defendant raises six arguments: (1) the CALCRIM No. 505 self-defense instruction improperly fails to allow for self-defense when self-defense was not the sole cause of the killing; (2) if mixed-motive self-defense does not justify acquittal, it should at least mitigate the murder to voluntary manslaughter; (3) the trial court erred in responding to the jury's question about the financial gain special circumstance; (4) evidence of defendant's cocaine use should have been excluded; (5) hearsay testimony about Brian's beliefs regarding defendant's conduct and character should have been excluded; (6) the court should have set a hearing on his motion for juror identifying information.[5] We reject each argument.

1.      *Preliminary Consideration – The Jury's Findings*

Before we begin our discussion, we observe that defendant's arguments dealing with mixed motives – relating to self-defense, imperfect self-defense, and the financial-gain special circumstance – are based on an incorrect view of the record. As the case was presented to the jury, the prosecution argued that defendant's motive was financial gain and defendant argued that his motive was self-defense. The jury asked the court whether the special circumstance could be found true if financial gain was only part of the reason for the killing. Defendant reasonably infers from this that the jury considered that financial gain, was, in fact, only part of the reason for the killing. Defendant next infers, however, that the jury must have concluded that his other motive was self-defense.[6] The conclusion does not follow. There was certainly evidence from which the jury could have inferred a second motive that is much more consistent with financial gain than self-defense. Defendant may well have developed a hatred towards Brian and wanted him dead. Defendant was clearly upset by Brian's disrespect of Perry, and might have chosen his girlfriend over his drug abusing, emotionally unbalanced son. Indeed, if the jury

---

[5]      Unless otherwise indicated, when we refer to self-defense, we include defense of others.

[6]      The prosecution makes the same inference.

12

rejected defendant's "three strikes" scenario and believed that Brian had not presented an imminent risk of death or great bodily harm to defendant and Perry at the moment defendant killed Brian, the jury still could have believed that Brian had threatened violence against Perry previously and defendant wanted his volatile son out of the picture before something serious happened. In short, the jury could have concluded defendant murdered his son for several reasons, only one of which was financial gain, and none of which were self-defense.

Moreover, another jury finding precludes the idea that the jury believed defendant acted, even in part, out of self-defense. The jury fixed the degree of the murder as first degree. The jury had been instructed that, to find defendant guilty of first degree murder, it must find that defendant acted "willfully, deliberately, and with premeditation." A jury's conclusion that a murder was committed with premeditation and deliberation indicates a complete rejection of self-defense. (*People v. Crandell* (1988) 46 Cal.3d 833, 874.) In *Crandell*, the court stated, "In concluding that no prejudice resulted from any of the claimed errors related to instructions on self-defense, we have considered, in addition to the specific factors previously mentioned, that the jury convicted defendant of the murder of [both victims] and that both murders were found to have been committed with premeditation and deliberation. These verdicts indicate a complete rejection of the evidence on which defendant relied to establish self-defense." (*Ibid.*) As Justice Dibiaso has written, "By convicting appellant of first degree murder, the jury determined appellant had acted willfully, deliberately and with premeditation. [Citation.] A mind that has determined to kill by the exercise of preexisting reflection is not a mind that has been moved to kill by an actual belief, formed in the moment of immediate peril, in the necessity to defend against that peril—an essential element of . . . self-defense."[7] Thus, while we address each of defendant's contentions, we do so without defendant's underlying assumption that the jury believed he was motivated in part by self-defense.

---

[7] Justice Dibiaso's words were contained in a non-published opinion, which we may not cite under California Rules of Court, rule 8.1115, but we felt it appropriate to give him attribution.

2.      *The Self-Defense Instruction Was Proper*

The jury was instructed on self-defense in the language of CALCRIM No. 505. The instruction provides, in pertinent part, that for the defendant to act in self-defense, the "defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else. Defendant's belief must have been reasonable and he must have acted *only because of* that belief." (Italics added.) Defendant argues that the instruction is improper in that a defendant should be permitted to take advantage of self-defense if the killing was only in part the result of a reasonable belief in the imminent danger of death or great bodily injury. In other words, defendant argues that the trial court erred in not instructing on mixed-motive self-defense.

At trial, defendant made no request to modify the standard instruction in any way. He did not argue mixed motives to the jury, nor did he raise the issue in his motion for new trial. Instead, defendant argues, for the first time on appeal, that the "*only because of*" language in CALCRIM No. 505 is based on a misinterpretation of Penal Code section 198.[8]

Defendant's argument includes a sprawling investigation into the pre-1872 legislative history of Penal Code section 198, early case authority, and federal due process. Defendant's opening brief notes that, although there is some authority suggesting that a defendant cannot claim self-defense unless fear was the defendant's only motive, the California Supreme Court has never so held.

While this case was pending on appeal, the Supreme Court reached the issue and rejected defendant's argument. In *People v. Nguyen* (2015) 61 Cal.4th 1015, 1044-1045, petn. For cert. filed Feb. 10, 2016 (*Nguyen*), our Supreme Court upheld CALCRIM No. 505, concluding that self-defense is not available if the defendant acts out of both reasonable fear and a desire to harm the attacker. The court clarified that the defendant

---

[8]      Penal Code section 198 provides, in pertinent part, that a "bare fear" is not alone sufficient to justify a homicide. Instead the "circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of *such fears alone*." (Italics added.)

14

can claim self-defense if the defendant has other *feelings* toward the victim. That is, the defendant may be angry at, or even hate, the victim. But to claim self-defense, the act of killing must have come from the fear alone; the defendant's other feelings toward the victim cannot be causal factors in the defendant's decision to use deadly force. (*Id*. at p. 1045.)

Defendant seizes on dicta in *Nguyen* to support his argument. The Supreme Court stated, "We note that defendant did not argue in the trial court, nor has he argued on appeal, that the jury should have been instructed that acting based on mixed motives is permissible so long as reasonable fear was the but-for cause of his decision to kill. We therefore have no occasion to consider whether such a rule would be consistent with section 198 as interpreted in . . . other cases." (*Nguyen, supra,* 61 Cal.4th at p. 1046.) Grasping on to this language, defendant filed a supplemental brief arguing that the trial court erred in not sua sponte instructing the jury that a secondary cause does not defeat self-defense unless it is both a but-for and proximate cause.[9] Like the *Nguyen* court, we conclude initially that defendant's failure to raise this argument at trial, or until after briefing had been completed in this case, precludes defendant from making it now.[10]

Even if we were to conclude that the instructional issue is before us and the trial court erred, any error was harmless beyond a reasonable doubt. First, as we noted above,

---

[9]     We also permitted California Appellate Defense Counsel to file an amicus brief on this issue, to which the Attorney General filed an answer. Although the amicus brief contains an apparently comprehensive discussion of the legislative history of self-defense statutes, the brief does not address *Nguyen*.

[10]     Similarly, we reject defendant's suggestion that his constitutional argument – that CALCRIM No. 505, without further explanation regarding mixed motives and causation, violates his due process rights – is cognizable on appeal. Our Supreme Court has recently upheld the instruction as a proper explanation of the governing principles of law. Indeed, it did so in a case in which the appellant had argued the instruction was unconstitutional (Appellant's Opening Brief in *People v. Nguyen*, p. 187) – an argument the Supreme Court did not specifically address, but impliedly rejected. If defendant believed that the instruction required clarification for constitutional or other reasons, he should have requested the trial court modify the instruction. (*People v. Chatman* (2006) 38 Cal.4th 344, 393.) He did not.

15

the jury found defendant murdered Brian with premeditation and deliberation, a mental state wholly contrary to being motivated by imminent fear. Second, defendant's testimony regarding the "three strikes" which Brian threatened, thereby placing him in imminent danger, was not worthy of belief by a reasonable jury. According to defendant, defendant and Brian were at the bank before noon; Brian went back to the house alone; when defendant returned to the house, Brian was beating on a broken door and yelling at Perry, calling "strike two." But this timeline is impossible. During the time defendant asserts this was occurring, Brian was in Sister Ingham's office seeking advice about whether to address his financial concerns with defendant, and telephoning Father Fulco on the same topic. Moreover, LAPD Officer Paul Corralejo went to the house at 1:30 that day, on a call of a female disturbance. Although a police officer came to the house, defendant did not mention anything about Brian's purported "second strike" threat to harm him and Perry. Defendant's "third strike" testimony was also contradicted by his own statement to the police. In one version Brian threw the pawn ticket at defendant saying it was strike three and left to get the mallet (as defendant testified at trial), and in another Brian phoned an hour before visiting, saying strike three was coming (as defendant told police). None of defendant's stories can be reconciled with the phone records. Finally, the testimony of every single witness except defendant who saw or spoke to Brian that day believed he was calm and under control. Sister Ingham, Father Fulco, Roldan, Brian's AA sponsor, Attorney Shultz, and the neighbor who saw defendant walk in unarmed each painted a unified portrait of a man who was upset and determined, but not in a violent rage. The only one with a contrary opinion was the man who shot him, and even he did not tell police Brian had threatened him until after he had killed Brian.

3.    *A Mixed-Motive Self-Defense is Not Voluntary Manslaughter*

Defendant argues in the alternative that if a mixed-motive self-defense is not a complete defense, it should at least mitigate the murder down to voluntary manslaughter. Defendant asserts that when someone kills in part based on the belief he must defend

16

himself against an imminent threat, that person does not harbor the malice necessary for murder.

There are two reasons why this argument fails. The first is that it, too, was rejected in *Nguyen*. In *Nguyen*, the defendant had argued that "his offense could be no more than manslaughter if he acted with the multiple motivations of self-defense and a desire to kill." (*Nguyen, supra,* 61 Cal.4th at p. 1047.) The court rejected the argument.[11] (*Id*. at pp. 1047-1048.) The second is, again, the jury's finding that the murder was in the first degree. That defendant acted with premeditation and deliberation means that the defendant also acted with malice, and not from imminent fear. This simply was not a mixed-motive self-defense case.

4.    *The Court's Response to the Jury's Question was Proper*

During deliberations, the jury submitted the following question on the financial gain special circumstance: "Does the primary reason for the killing have to be for financial gain or can financial gain be only part of the reason the killing was carried out?" The court answered, in writing, "Does the financial gain have to be the primary reason for the killing? No. Can financial gain be only part of the reason? Yes." On appeal, defendant argues this answer was incorrect, and that, in order to find the financial gain special circumstance to be true, the jury had to find that financial gain was the but-for cause of the killing.

Preliminarily, the point is waived. The court's minute order indicates that, upon receiving the jury's question, the court "confer[red] with the Deputy District Attorney and defendant's counsel . . . and formulate[d] a written response" which was submitted to the jury. The record reflects no defense objection. Acquiescence in the court's response

---

[11]    In his post-*Nguyen* supplemental brief, defendant parses the language of the *Nguyen* opinion, suggesting that the court held only that a case on which Nguyen had relied did not support the proposition, not that the proposition itself had no merit. While defendant's description may be literally correct, we nonetheless are presented with recent Supreme Court authority rejecting the precise proposition defendant is now asserting. We are obligated to follow that precedent.

constitutes forfeiture of the argument on appeal.**12** (*People v. Rogers* (2006) 39 Cal.4th 826, 877; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1048.)

In any event, the court's answer was correct. The financial gain special circumstance applies even if the proposed financial gain is only a secondary purpose to the killing; it need not be the primary purpose. (*People v. Michaels* (2002) 28 Cal.4th 486, 519; *People v. Noguera* (1992) 4 Cal.4th 599, 634-645.)

Defendant argues to the contrary, based on an overly-broad reading of *Burrage v. U.S.* (2014) 134 S.Ct. 881, a case which in this context is not binding on us. In *Burrage*, the Supreme Court interpreted a provision of the Controlled Substances Act which imposed a 20-year mandatory minimum sentence on a defendant who distributed a schedule I or II drug when death or great bodily injury "results from the use" of the substance defendant sold. (*Id.* at p. 885.) The defendant had sold the victim heroin, but the victim died from an overdose of multiple drugs; the heroin was simply a contributing factor in the death. (*Id.* at pp. 885-886.) The question before the Supreme Court was whether "results from" in the statute could be satisfied when the heroin was a concurrent cause, but not a but-for cause, of the death; the court concluded that it could not. (*Id.* at pp. 887-889.) *Burrage* was concerned with the interpretation of specific language

---

**12**      Defendant suggests that he did not necessarily agree; the minute order states only that the court conferred with counsel, not that counsel agreed with the court's written response. But earlier when the jury left the courtroom to begin deliberations, the court placed on the record its procedure for handling jury questions. The court stated that, when it receives a question from the jury, the court "will look at it, make a tentative decision on how I intend to answer the question. I will then contact the attorneys telephonically, let them know how I intend to deal with the question. If everybody agrees, I write the answer on the form and it gets sent into the jury deliberation room. Nothing is done in open court. [¶] If, on the other hand, either counsel wishes to litigate the issue, they disagree with the way that I am intending to answer it, then obviously it will be done in open court. They'll be brought out into the courtroom and we will decide the matter that way." Given this explanation of the court's procedure, it is apparent that both counsel agreed with the court's proposed response, which was submitted to the jury without any disagreement placed on the record. As such, defendant's objection to the answer is forfeited.

18

Congress had used in a federal statute; the court was not imposing a definition of causation as a matter of constitutional mandate. Indeed, in the course of its analysis, the Supreme Court recognized that a minority of jurisdictions have adopted the principle that an act "is considered a cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result." (*Id.* at p. 890.) The court recognized that California was one such jurisdiction, citing *People v. Jennings* (2010) 50 Cal.4th 616, 643. *Burrage* did not purport to overrule California law by adopting a constitutionally mandated definition of causation applicable for all criminal statutes. The Supreme Court only concluded that Congress, in enacting the mandatory minimum sentencing provision of the Controlled Substances Act, had intended the narrower, but-for definition. (*Burrage, supra,* at p. 891.) *Burrage* has no bearing on whether California's financial gain special circumstance can be satisfied when financial gain is only a secondary goal of the killer.

5.      *There was No Error in Admitting Evidence of Defendant's Cocaine Use*

In the prosecution's case in chief, the prosecutor was permitted to introduce evidence of defendant's cocaine use. The evidence included: (1) a neighbor testifying that, around the time defendant started seeing Perry, defendant lost as much as 30 or 40 pounds and many cars came to the house at all hours of the night; (2) a friend of defendant testifying that defendant told him that Perry had introduced him to cocaine, which defendant believed was the greatest drug ever invented, and the friend once saw a white substance around defendant's nostrils; and (3) police testimony that after the murder, Cary telephoned police about a woman's purse he found in the house; the purse contained a baggy with cocaine residue. This evidence was admitted over defendant's objection as proof of motive; it supported the prosecution's theory that defendant killed Brian to keep control of the estate in order to, among other things, support his drug habit.

Defendant contends the court abused its discretion in admitting the evidence, in that it was more prejudicial than probative. (Evid. Code, § 352.) We review a court's ruling under Evidence Code section 352 for abuse of discretion. (*Nguyen, supra,* 61 Cal.4th at p. 1035.)

19

We first consider the probative value of the evidence. An individual's prior bad acts may be admissible to prove motive. (Evid. Code, § 1101, subd. (b).) More specifically, a defendant's drug use can be admissible to prove motive. (*People v. Chatman, supra,* 38 Cal.4th at p. 371 [that defendant used money from a robbery to buy drugs established a motive for the robbery].) However, "[n]arcotics use must have a *direct* probative value to establish motive before its admission is permitted." (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1393.) Drug use is most often admitted where obtaining narcotics was the direct object of the crime committed. (*People v. Cardenas* (1982) 31 Cal.3d 897, 906.) Here, the probative value of the cocaine evidence admitted in the prosecution's case in chief was weak. The evidence established, at most, that several months before the killing, Perry introduced defendant to cocaine, and he continued to use it thereafter. This evidence had the same relevance to the financial gain special circumstance as did the evidence that defendant took Perry to Las Vegas and spent money on her – both types of evidence showed that defendant was spending money, perhaps from the estate. Combined with other evidence of defendant needing a loan, this evidence tended to show that defendant was spending more money than he had. The evidence was relevant, but not extraordinarily so.

We now turn to prejudice. " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' [Citation.]" (*Nguyen, supra,* 61 Cal.4th at p. 1035.) Defendant relies on authority that the impact of narcotics addiction evidence on a lay jury is " 'catastrophic. . . . It cannot be doubted that the public generally is influenced with the seriousness of the narcotics problem . . . and has been taught to loathe those who have anything to do with illegal narcotics in any form

20

or to any extent.' [Citation.]" (*People v. Cardenas, supra,* 31 Cal.3d at p. 907.) While we do not take issue with this statement of prejudice generally, we do not believe it applies in this case for several reasons. First, defendant was not the only drug user in this case; defendant elicited testimony that Brian had used both cocaine and heroin. If the jury was going to loathe defendant for his cocaine use, it would loathe Brian. Second, defendant was charged with murdering his son; while a jury most likely would consider drug use negatively, it is difficult to believe a jury would have such an emotional bias against defendant for using cocaine that it would convict him of filicide because of it. Third, as we discuss below, evidence that Brian knew about defendant's cocaine addiction was itself admissible to explain Brian's conduct; thus, even if direct evidence of defendant's cocaine use had been excluded, the jury still would have heard that Brian believed defendant used cocaine. On balance, while the cocaine evidence in this case was not particularly probative, it was not particularly prejudicial either. The court did not abuse its discretion by admitting it.[13]

6.    *There was No Error in Admitting Evidence of Brian's Beliefs Regarding Defendant's Conduct and Character*

Evidence was admitted that Brian believed defendant was draining the estate, and that Brian feared defendant because defendant was using drugs that made him unpredictable and angry. This evidence was admitted as proof of Brian's attitude toward defendant, not for the truth of those matters. Evidence was also admitted that in December 2006, Brian made a handwritten will leaving everything to defendant except for some personal possessions. Also admitted as evidence of Brian's attitude toward his father was the testimony of Brian's boyfriend who stated that Brian told him defendant had asked Brian to prepare the will.[14]

---

[13]    If there was error, it was necessarily harmless in light of defendant's subsequent testimony that he used cocaine the very morning of the murder.

[14]    Brian's boyfriend did not testify that Brian had directed the disposition in the will; he said only that Brian made the will for his father and that his father had asked him to prepare it.

Evidence Code section 1250, subdivision (a)(2) provides that evidence of a statement of the declarant's then existing state of mind is not made inadmissible by the hearsay rule when the evidence is offered to prove or explain acts or conduct of the declarant. Even if the statement does not directly declare a mental state but is "merely circumstantial evidence of that state of mind, [it] is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389.) Such evidence must be relevant to be admissible; that is, the declarant's state of mind must be germane to the case. (*Ibid.*) In cases where a defendant relies on self-defense, the victim's state of mind is, in fact, at issue, and evidence of the victim's state of mind is generally admissible. (*People v. Garcia* (1986) 178 Cal.App.3d 814, 822; *People v. Spencer* (1969) 71 Cal.2d 933, 945.)

When evidence is admitted as circumstantial evidence of the declarant's mental state and not for the truth of the matter, a limiting instruction is necessary. (*People v. Ortiz, supra,* 38 Cal.App.4th at p. 389.) Proper limiting instructions were given when defendant requested them in this case, and defendant does not contend otherwise.[15] Defendant argued at trial and does so here that some of the evidence of Brian's mental state so strongly implies the truth of the underlying matter that no limiting instruction could be sufficient. Those statements should, therefore, have been excluded.

One appellate court has expressed the dilemma this way: Suppose the declarant states a *belief* that the defendant did an act which the declarant could not actually know that the declarant did – such as driving by the declarant's house when the declarant could not see him. In that case, a limiting instruction would be easy for a jury to follow, because what is relevant is that the declarant believed the defendant drove by, not whether he actually did. On the other hand, suppose the declarant states a belief that the defendant did an act and the statement itself implies personal knowledge. An example

---

[15]     Defendant did not, however, request a limiting instruction as to the statement that Brian made his will at defendant's request.

22

could be that the declarant stated she was afraid of defendant because defendant had beaten her up before. As the declarant would clearly know whether the defendant had assaulted her, it would be difficult for a jury to separate the concept that the declarant was afraid of defendant (admissible) from the underlying fact that the declarant had actually done so (inadmissible hearsay). (*People v. Ortiz, supra,* 38 Cal.App.4th at pp. 389-390.) In those latter cases, in which the declarant's statement implies personal knowledge of the defendant's acts, it is difficult for a jury to follow a limiting instruction, and jurors may very well accept the truth of the underlying facts. (*Id.* at p. 390.)

At one time California had a rule that declarations of a victim to show state of mind are inadmissible if they "refer solely to alleged past conduct on the part of the accused." (*People v. Hamilton* (1961) 55 Cal.2d 881, 893-894; see *People v. Ortiz, supra,* 38 Cal.App.4th at p. 386.) No such absolute bar presently exists. (*Id.* at pp. 387-388.) Instead, a statement made by a victim regarding prior acts of the defendant offered to prove the victim's state of mind – whether or not those statements imply personal knowledge of the defendant's prior conduct – are generally admissible, within the constraint of Evidence Code section 352. "Where the statement is offered as relevant circumstantial evidence to the victim's state of mind, the court may consider such things as the prejudicial nature of the conduct attributed to appellant; the demeanor of the declarant as described by the witnesses and other circumstances attendant to the making of the statement; and whether the circumstances of the statement are such that the jury will be unable to follow the limiting instruction. If the court concludes that the jury will be unable to use the evidence solely within its limitations, the court should exercise its discretion and exclude the evidence." (*Ortiz,* at p. 392.)

Defendant argues that under Evidence Code section 352 the court abused its discretion in admitting testimony from other witnesses that (1) Brian believed that defendant was draining the estate; (2) that Brian was afraid of defendant, because, among other things, of defendant's cocaine use and (3) defendant had asked Brian to prepare a will. Defendant claims prejudice because those statements all implied Brian's personal knowledge of the underlying facts and that the limiting instruction therefore was

23

ineffectual.  We disagree.  That Brian believed defendant may have been pilfering the estate does not imply personal knowledge; to the contrary, the only one with personal knowledge of these facts would have been defendant himself, as defendant did not provide Attorney Shultz with the necessary financial data for Brian to know the true facts.  The jury reasonably could have followed a limiting instruction and separated Brian's belief from the "true" facts whatever they may have been.  That Brian believed defendant was using cocaine was an inference Brian could have drawn from speaking to defendant's friends; it does not imply that he personally watched defendant use cocaine.  In any event, others testified to defendant's cocaine use, as did defendant himself.  That Brian believed defendant was unpredictable and angry also does not necessarily imply personal knowledge as others could have discussed this with Brian.  Defendant's own words illustrate the distinction.  Defendant told police that Cary had called Brian and falsely told him that a relative had given defendant $12,000 and defendant had spent it on drugs.  Thus, defendant's statement to police confirms that Brian believed defendant to have been wasting money on drugs, while simultaneously indicating that the belief was not necessarily based on personal knowledge and may, in fact, have been mistaken.  Thus, the jury would have been expected not to have considered this multiple hearsay for the truth and to follow the instruction that it be considered only for Brian's state of mind.  In any event, testimony by others about Brian's fear of his father consisted only of conclusions, not the underlying facts that had shaped his state of mind.

In the framework of the Evidence Code section 352 analysis, all of this evidence was highly probative.  This case came down to two competing, inconsistent views of Brian's motivation in coming to the house on the afternoon of March 2.  According to defendant, Brian was a mentally unstable drug addict with a history of violence and threats against his parents.  He had threatened Perry, unreasonably demanded she leave the house, and, by the time he arrived at 4:50 p.m., had already claimed Perry used two of her three strikes.  He came to the house to do violence to defendant and Perry.  In contrast, according to the prosecution, Brian had a history of depression and drug dependence, but had two years of sobriety and was getting his life together.  He had been

24

happy to let his father handle his mother's estate, but when he saw Perry lead defendant down a path into addiction and waste, he wanted to say something. Whether or not true, Brian believed his father's life was spiraling out of control; he was mismanaging the estate, wasting money on drugs, and his cocaine use made his behavior unpredictable and his manner angry. Brian went to the house not for a violent confrontation, but, as Sister Ingham testified, for a one-man intervention, an attempt to make his father see reason and stop squandering the estate's money on drugs. Evidence that defendant believed his father was mishandling the estate and using drugs was therefore of critical importance to Brian's motivation in coming to the house, and, in turn, to rebut defendant's claim of self-defense. As the evidence was highly relevant and any prejudice could be resolved with a limiting instruction, the court did not err in admitting the evidence.

Our analysis is somewhat different with respect to Simon Ryan's testimony about Brian's statement that he made his will at his father's request. This statement appears founded on Brian's personal knowledge since the request was made to Brian.[16] Any prejudice flowing from this evidence does not outweigh the probative value such that the court abused its discretion in admitting the evidence. Brian had made a will leaving nearly everything to defendant. That he did so, in late December 2006, is evidence that he did not, at least at that time, have the intent to kill his father. Rather, the evidence suggests that Brian and defendant were working together for the long term financial good of the family. Defendant also testified that he would have inherited everything from Brian had Brian died intestate. In other words, defendant knew that he would inherit from Brian even had he not directed Brian to make a will. The court did not err in admitting the evidence.

---

[16] Even there, defendant offered a possibility of "misinterpretat[ion]" on Brian's part. Defendant admitted having a conversation with Brian about wills, in which defendant told Brian that if he did not have a will, defendant would inherit everything from him, and if Brian had a will, he could keep things from going to defendant. He thought Brian might have misinterpreted his words, or simply lied to his partner about what defendant had said.

25

7.    *The Court Did Not Err in Refusing a Hearing on Defendant's Request for Juror Identifying Information*

While this appeal was pending, defendant sought juror identifying information contending that after the jury was discharged someone claiming to be a juror named "Lee" posted on a blog devoted to Brian. Before trial, the jurors had been given the standard pretrial admonition to not "use the internet in any way in connection with this case." (CALCRIM No. 101.) The jury returned its verdict at 11:21 a.m. on February 7, 2014. After the jury was polled, the court released the jurors, and specifically informed them that they were free to discuss the case and their deliberations with anyone. That night, at 9:35 p.m., someone identifying himself as "Lee" posted on a blog commemorating Brian. Lee posted, "Carl was convicted of first degree murder today. I was on the jury." On February 10, someone else posted, "Lee, I testified at this trial. Was it even close? Does the jury decide the sentence?" One week later, Lee responded, "It was not very close. 10-2 for guilty at the first vote, really only one hold out after that. The jury does not decide the sentence. We had, 1st deg murder, 2nd deg murder, manslaughter and not guilty to choose from and voted for 1st degree." Lee made no further posts on the blog. However, before the jury reached its verdict, posts on the blog from other people included incendiary comments about defendant, including comments that implied defendant had killed Judy.

Assuming that Lee was, in fact, a juror, there was no misconduct in Lee's posting to the blog after the jury was discharged. Defendant argues that Lee may have read the blog during trial, and exposed himself to prejudicial information others had posted. Defendant sought juror identifying information to discover the identity of Lee and, assuming Lee was a juror, determine whether Lee had committed misconduct by viewing the blog during trial. The court declined to set a hearing on defendant's motion on the basis that defendant had not established good cause.

"Under Code of Civil Procedure section 237, in a criminal case, the trial jurors' 'personal juror identifying information'—defined as their names, addresses, and telephone numbers—must be sealed after their verdict is recorded. (Code Civ. Proc.,

26

§ 237, subd. (a).) However, '[a]ny person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.' (Code Civ. Proc., § 237, subd. (b); see Code Civ. Proc., § 206, subd. (g).) [¶] If the trial court finds that the moving party has made a prima facie showing of good cause, and if it finds no compelling interest against disclosure, it must set the matter for hearing. (Code Civ. Proc., § 237, subd. (b).) The trial jurors are entitled to notice, an opportunity to object to disclosure, and an opportunity to appear. (Code Civ. Proc., § 237, subd. (c).) [¶] If none of the jurors object, the trial court must grant disclosure. However, if a juror is unwilling to be contacted, the trial court must deny disclosure. (Code Civ. Proc., § 237, subd. (d).)" (*People v. Johnson* (2013) 222 Cal.App.4th 486, 492.) We review the denial of a petition for disclosure for abuse of discretion. (*People v. Cook* (2015) 236 Cal.App.4th 341, 345-346.)

Prior to the enactment of Code of Civil Procedure section 237, a party seeking disclosure of juror information was required to set forth a " 'sufficient showing to support a reasonable belief that jury misconduct occurred.' " (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.) The same test applies under Code of Civil Procedure section 237. (*People v. Cook, supra,* 236 Cal.App.4th 341, 345-346; *Carrasco* at p. 990.) Good cause does not exist "where the allegations of jury misconduct are speculative, conclusory, vague or unsupported." (*Cook,* at p. 346.)

The trial court concluded that defendant failed to establish a prima facie showing of good cause, and we find no abuse of discretion. Defendant was required to make a sufficient showing to support a reasonable belief that jury misconduct had occurred. We accept that defendant made an adequate showing that "Lee" was a juror. But the trial court reasonably could have concluded that there was no misconduct. Defendant established only that Lee, after serving as a juror in a murder trial and after having been released from his obligation not to perform outside research, may have been curious enough to do an internet search of the names of the parties involved. That Lee read a blog posttrial no more gives rise to an inference that he read the blog during trial than a

27

juror speaking with the victim's family after trial gives rise to an inference that he spoke to them before trial.  The court did not abuse its discretion in declining to make that leap.

## DISPOSITION

The judgment is affirmed.  The posttrial order denying defendant's motion for release of juror identifying information is also affirmed.


RUBIN, J.

WE CONCUR:


BIGELOW, P. J.


FLIER, J.

28