Filed 4/8/26 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PEDRO THOMAS DELEON TZUL,<br><br>    Defendant and Appellant. | B343256<br><br>(Los Angeles County<br>Super. Ct. No. BA496514)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>(No change in the appellate judgment) |

THE COURT:

The opinion filed on March 23, 2026 is modified as follows:

On page 21, the first two sentences of the paragraph beginning with "Like the victim in *Ortiz, supra*, 38 Cal.App.4th 377, Tzul could have been mistaken" are deleted and replaced with the following language:

Like the victim in *Ortiz, supra*, 38 Cal.App.4th 377, Tzul could have been mistaken about what Martha and Antonio were doing. But even if he was wrong, his statement was relevant to show what he believed he discovered.

There is no change in the appellate judgment.

Respondent's petition for rehearing is denied.

_____
MARTINEZ, P. J.                SEGAL, J.                GIZA, J.*

_____
*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.

Filed 3/23/26 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>PEDRO THOMAS DELEON TZUL,<br><br>　　　Defendant and Appellant. | B343256<br><br>(Los Angeles County<br>Super. Ct. No. BA496514) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Gustavo N. Sztraicher, Judge.  Reversed with directions.

　　　Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Trial courts have broad discretion to exclude evidence under Evidence Code section 352[1] if the evidence's probative value is substantially outweighed by the probability the evidence will create a substantial danger of undue prejudice. Broad, but not limitless. This appeal tests the limit.

Pedro Thomas DeLeon Tzul appeals from the judgment after a jury convicted him of first degree murder for killing his girlfriend, Martha Garcia, and second degree murder for killing Martha's brother, Antonio Garcia. Tzul argues the trial court erred in excluding a handwritten note found at the crime scene that included statements by Tzul indirectly admitting he killed Martha and Antonio, but stating he acted in a rage after discovering they were having sex. The trial court excluded the note under section 352 on the prosecutor's objection during the People's case, but ultimately admitted the note when Tzul, to show he acted with provocation, was forced to testify to get the note into evidence. He argues the trial court's error was prejudicial because, had he not testified, it is reasonably likely the People would not have presented sufficient evidence of premeditation and deliberation to convict him of first degree murder or of malice to convict him of second degree murder.

We conclude that, though the trial court did not err in denying Tzul's motion for a judgment of acquittal under Penal Code section 1118.1, the court erred in sustaining the prosecutor's objection to the admission of the note. We also

---

[1]    Undesignated statutory references are to the Evidence Code.

conclude that, had the trial court admitted the note in the People's case and not required Tzul to testify to get the note into evidence, it is reasonably probable Tzul would not have been convicted of first degree murder or even second degree murder.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Tzul Kills His Girlfriend and Her Brother*

Tzul, who was 41 years old, and Martha, who was 35 years old, lived together for six years. In May or June 2021 Martha's 21-year-old brother, Antonio, arrived from Mexico and moved into their apartment. On June 22, 2021 a neighbor whose unit faced Tzul and Martha's apartment heard shrieking. Two days later Tzul sent a text message to his siblings: "Forgive me and don't worry about me. I'll find a way to live a new life after what I did." He also wrote: "I did something terrible, and don't get[ ] close to the place where I lived because it is a big disaster."

Concerned by the text messages and unable to reach Tzul or Martha by phone, Tzul's brothers and his mother went to the apartment, and the building manager unlocked the door. When the manager entered the apartment, he noticed it was "freezing cold" and saw two bodies on the floor rolled in carpets. A paramedic unrolled the rugs, which were tied with cords, discovered the bodies of Martha and Antonio, and determined they were dead. Martha had 29 stab wounds, including one to her neck, one that punctured her lung, and one that caused her small intestine to protrude. Antonio had 37 stab wounds, including a sharp force injury across his neck that cut all the way to the spinal column. There were blood trails and spatter

3

throughout the apartment. Police found a bag with bloody rags and rubber gloves in a trash can.

A window air conditioning unit was on a coffee table blowing cold air toward the two bodies. They had not decomposed significantly because it was cold and there was very little blood left in the bodies. Police located Tzul in Mexico, and he was extradited to Los Angeles.

B.    *The Trial Court Excludes Evidence of a Handwritten Note During the People's Case*

The People charged Tzul with two counts of murder. (Pen. Code, § 187, subd. (a).) The People alleged as an aggravating circumstance the crimes involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness, within the meaning of California Rules of Court, rule 4.421(a)(1).

The People filed a motion in limine to preclude Tzul from introducing into evidence a handwritten note the police found at the scene. The note read: "I found her having sex with her own brother and that fills me with rage. I'm asking for forgiveness. I don't know whether God will do it." The trial court ruled that Tzul could not, during the People's case, introduce the note into evidence or cross-examine the detective who found the note, but that Tzul could testify about the note if he chose to testify.

C.    *Tzul Testifies and Introduces the Handwritten Note*

During the defense case Tzul testified on direct examination he wrote the note, and he read it out loud. He also introduced the note into evidence.

4

The prosecutor cross-examined Tzul at length about the killings.[2] Tzul testified that he and Martha had been together for 12 years and that they had been trying without success to have a child. Tzul stated that, one day after Antonio came to live with him and Martha, Tzul took his mother home and, as he drove back to his apartment, he called Martha. While the phone was ringing, Tzul had a "vision" Martha was "having sex with someone," which left him "speechless." Tzul sent Martha a text message stating he was going to stop at a gas station, but instead he went straight home. When he got his keys out to open the door, he heard someone running inside. He went in and saw Antonio acting "nervous." Tzul also noticed Antonio hugged Martha a lot, and he told detectives that Antonio and Martha brushed their teeth together and talked for hours in the bedroom.

Because Tzul felt Antonio and Martha's behavior was "incorrect," he decided to record their interactions. Before Tzul left for work, he put a cellphone on a shelf in the bathroom and turned on an audio recorder. When Tzul returned, the phone was in a different position, but was still recording. A day or two later, he left another phone to record in the bedroom, and he heard them "having sex in the living room."

On June 22, 2021 Martha and Antonio went for a walk. Tzul told Martha he was going to his mother's house, and he called his brother Julio and asked Julio to say that, if Martha called, Tzul had gone to see his mother. Tzul moved his car so

---

[2] Tzul testified only briefly on direct examination: He identified the note, said he wrote it, and read it to the jury. Counsel for Tzul objected to the prosecutor's cross-examination as beyond the scope of direct examination, but the trial court overruled the objection. Tzul does not challenge that ruling.

5

Martha would think he was not home. He went into the apartment, hid under the bed, and muted his phone. When Tzul got close to the bathroom door, he heard Martha making "very sensual sounds." Tzul went to the kitchen to clear his mind, but he "felt a force that [he] had never felt before," "a lot of pain," and "pressure inside" him. He grabbed a knife from the table, put it in his pocket, and walked into the bedroom. Tzul closed the bedroom door and "attacked [Martha] like an insane man." Martha screamed, and Antonio came to the bedroom. Tzul was "attacking out of control." Antonio grabbed Tzul's hand, but Tzul "put him under control very quickly, and everything happened very quickly." Tzul stabbed Antonio and chased him into the living room. He "didn't understand what [he] was doing" and "had already become . . . a monster." Tzul dragged Martha's body out of the bedroom, wrapped the two dead bodies in rugs, tied them with cords, and stacked them on top of each other. He cleaned the knife and put it in a drawer, took a bath, and left for Mexico.

Tzul's mother testified she thought Martha and Antonio's interactions were too intimate for siblings. She stated that Martha caressed Antonio's head, that Antonio hugged Martha around the waist, and that they laughed and spoke in a language Tzul's mother did not understand.

> D.    *The Jury Convicts Tzul, and the Trial Court Sentences Him*

The jury found Tzul guilty of first degree murder for the killing of Martha and guilty of second degree murder for the killing of Antonio. The jury also found both offenses involved great violence, great bodily harm, threat of great bodily harm, or

6

other acts disclosing a high degree of cruelty, viciousness, or callousness, within the meaning of California Rules of Court, rule 4.421(a)(1).  The trial court sentenced Tzul to consecutive terms of 25 years to life on his conviction for first degree murder and 15 years to life on his conviction for second degree murder.  Tzul timely appealed.

## DISCUSSION

A. *The Trial Court Did Not Err in Denying Tzul's Motion for Judgment of Acquittal Under Penal Code Section 1118.1*

After the People presented their case, Tzul moved under Penal Code section 1118.1 for a judgment of acquittal of first degree murder on the ground there was insufficient evidence of premeditation.  The trial court denied the motion.  The court stated that Tzul bought the air conditioning unit and placed it in front of the dead bodies and that the "only reasonable inference to be drawn" from the evidence was Tzul "had a plan" to use the air conditioner to prevent the bodies from decomposing and starting to smell, allowing Tzul to "make his getaway."

1. *Applicable Law and Standard of Review*

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."  (Pen. Code, § 187, subd. (a).)  "'First degree murder "has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty."'"  (*People v. Alvarez* (2025) 18 Cal.5th 387, 470; see *People v. Gomez* (2018) 6 Cal.5th 243, 282.)  "'"'In this context, 'premeditated' means 'considered beforehand,' and 'deliberate'

7

means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'" [Citation.] "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"'" (*In re Lopez* (2023) 14 Cal.5th 562, 580; see *People v. Morales* (2020) 10 Cal.5th 76, 88.)

In *People v. Anderson* (1968) 70 Cal.2d 15 the Supreme Court "identified 'three basic categories' of evidence that may be probative of premeditation and deliberation: 1) planning activity, 2) motive, and 3) manner of killing." (*People v. Barrett* (2025) 17 Cal.5th 897, 965 (*Barrett*); see *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) Though the *Anderson* factors are "intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations," they "are not exhaustive or exclusive." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1270; see *People v. Morales*, *supra*, 10 Cal.5th at p. 89.)

Penal Code section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on

8

appeal." We review an order denying a motion for acquittal under Penal Code section 1118.1 "'using the same standard "employed in reviewing the sufficiency of the evidence to support a conviction."'" (*Barrett, supra,* 17 Cal.5th at p. 964; see *People v. Veamatahau* (2020) 9 Cal.5th 16, 35.) Where a defendant makes a motion under Penal Code section 1118.1 "at the close of a prosecutor's case-in-chief," we examine "the state of the evidence as it stood at that point." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215; see *People v. Cole* (2004) 33 Cal.4th 1158, 1213.) We "'review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Cardenas* (2025) 18 Cal.5th 797, 821; see *People v. Hin* (2025) 17 Cal.5th 401, 451.) "'Our review ""presume[s] in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.'" [Citation.] Even where . . . the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ""be reasonably reconciled with the defendant's innocence."'" [Citation.] Instead, we ask whether there is ""' substantial evidence of the existence of each element of the offense charged"'" such that any rational jury may have convicted defendant.'" (*Barrett,* at p. 964; see *Veamatahau,* at pp. 35-36.)

9

## 2. *There Was Substantial Evidence Tzul Killed Martha with Premeditation and Deliberation*

Tzul argues the trial court erred in denying his motion under Penal Code section 1118.1 for acquittal on the first degree murder charge at the close of the People's case. He contends that "there was no solid evidence of planning" and that the "brutal and frantic" manner of killing was inconsistent with premeditation or deliberation. The People, however, presented substantial evidence of premeditation and deliberation.

First, Tzul's conduct in purchasing the air conditioner and positioning it next to the bodies was evidence of planning. A forensic pathologist testified that a body begins to smell as it decomposes and that a colder temperature "significantly slows down the rate of decomposition." The building manager testified that, when he entered the apartment and discovered the bodies, it was "really cold."

The location of the air conditioner supported an inference its purpose was to preserve the bodies, not to cool the room. The bodies were rolled in rugs and placed on the floor between a coffee table and an entertainment center with a television. The air conditioner, which was a window unit rather than a portable unit, was on the coffee table blowing cold air on the two bodies. The air conditioner's power cord ran from the table to the entertainment center. There was evidence the air conditioner had been purchased recently: Police found the box for the air conditioner on top of the refrigerator, a plastic bag containing installation hardware on a chair in the living room, and the installation and instruction manual on the dining room table. In addition, in the weeks before the killings, Tzul called the building manager two or three times asking him to install a window air

10

conditioning unit, with the last call occurring within one week of the killings. From this evidence the jury could reasonably infer Tzul formulated a plan to kill Martha and use the air conditioner to slow the decomposition of her body while he escaped to Mexico.

Second, the manner of killing supported a finding Tzul killed Martha deliberately and with premeditation. Tzul stabbed Martha 29 times. Her throat was "cut from side to side," through the left external jugular vein and the larynx. Martha also had two "slicing wounds" from the corners of her mouth and a three-and-one-half inch deep stab wound to the left chest that punctured her lung, and her small intestine protruded from a wound to the abdomen. (See *People v. Morales*, *supra*, 10 Cal.5th at p. 91 [that the killing was "prolonged . . . supports an inference of deliberation"]; *People v. Potts* (2019) 6 Cal.5th 1012, 1028 ["'plunging a lethal weapon into the chest evidences a deliberate intention to kill'"]; *People v. Elliot* (2005) 37 Cal.4th 453, 471 [three lethal knife wounds and almost 80 other stab and slash wounds supported an inference of "a preconceived design to kill"]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658-659 ["sheer number of wounds on [the victim's] body, many of which individually would have been fatal, . . . supports a finding of deliberation"].)

Citing *People v. Williams* (2018) 23 Cal.App.5th 396 at page 410, Tzul argues "the manner of killing was so brutal and frantic, it 'is, at least in a vacuum, associated with someone losing his mind and going berserk, [and] . . . not a state of mind we associate with premeditation or deliberation.'" *Williams* does not support Tzul's argument. In *Williams* the defendant stabbed his wife twice in the neck and inflicted blunt force injuries on her head, neck, torso, and extremities. (*Id.* at p. 401.) The defendant

argued the victim's injuries showed an absence of premeditation and deliberation. (*Id.* at p. 410.) The court in *Williams* disagreed: "The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk attack, as suggested by defendant's briefing. But it was permitted to find otherwise." (*Ibid.*) The same is true here: The number and severity of knife wounds supported a finding Tzul killed Martha deliberately and with premeditation, even if the same evidence might have supported a contrary inference. (See *Barrett*, *supra*, 17 Cal.5th at p. 966 ["that the evidence might also be reconciled with a contrary conclusion as to premeditation and deliberation does not render it insufficient to overcome a motion for acquittal"]; *People v. Veamatahau*, *supra*, 9 Cal.5th at p. 36 [in reviewing an order denying a motion under Penal Code section 1118.1, we do not "'inquire whether the evidence might "'"be reasonably reconciled with the defendant's innocence"'"'"].)

Tzul also argues the "trial court incorrectly denied the motion for dismissal based on the presence of an air conditioning unit." Tzul contends that he asked the manager to install an air conditioner years earlier and that it was 90 degrees on the day of the killings. He argues there was no evidence that he brought a knife into the apartment or that he told anyone he intended to kill Martha. These arguments, however, ask us to reweigh the evidence and reach a different conclusion than the one the trial court reached in denying Tzul's motion under Penal Code section 1118.1—tasks not appropriate for appellate review. (See *People v. Houston*, *supra,* 54 Cal.4th at p. 1215 [in reviewing an order denying a motion under Penal Code section 1118.1, we "do not reweigh evidence"].) Because the People presented substantial evidence Tzul killed Martha deliberately and with

12

premeditation, the trial court did not err in denying his motion under Penal Code section 1118.1.

B.    *The Trial Court Prejudicially Erred in Excluding the Handwritten Note Under Section 352 During the People's Case*

1.    *Relevant Proceedings*

As discussed, the People filed a motion in limine to preclude Tzul from introducing into evidence the handwritten note he left at the scene. The People argued the statement "I found her having sex with her own brother and that fills me with rage" was inadmissible hearsay.

The court heard extensive argument on the admissibility of the note. Counsel for Tzul argued the note was admissible under section 1250, subdivision (a), which provides an exception to the hearsay rule for statements of the declarant's state of mind to prove that state of mind or to explain acts by the declarant. Counsel argued Tzul's subjective belief Martha and Antonio were sleeping together was relevant to Tzul's provocation defense, even if he was objectively incorrect. Counsel stated he would introduce the note during cross-examination of the detective who found it. Counsel further argued excluding the note would violate Tzul's constitutional rights because there was "no other way that we can get this evidence [the note] in other than him forfeiting his Fifth Amendment right."

The prosecutor asked the court to exclude the note under section 1252, which states: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

13

The prosecutor argued "statements of a defendant are not trustworthy because they're made to escape liability."

The court initially determined the portion of the note stating Tzul was "filled with rage" was admissible under section 1250 as "a statement written by the defendant that reflects on his state of mind at an earlier time when his state of mind is at issue." The court said that it would admit the note and that it would instruct the jury the portion of the note about the victims having sex was "not being offered for the truth of the matter asserted."

The prosecutor asked the court to revisit the ruling. The prosecutor argued the note lacked foundation unless Tzul testified that and when he wrote it. The prosecutor also argued that, without evidence of a provocative act (that Tzul discovered Martha and Antonio were having sex), which the prosecutor asserted was inadmissible hearsay, evidence Tzul was filled with rage was not relevant and should be excluded under section 352.

The court reconsidered its ruling on the admissibility of the note and, after a break in the proceedings, ruled the note was inadmissible under section 352. The court stated Tzul's statement he was filled with rage was not relevant without the reason for his provocation. The court said, however, Tzul's statement he found Martha having sex with her brother "would not be relevant unless it's true. So it really is being offered for the truth of the matter asserted in conjunction with corroborating his state of mind." The court stated that it considered instructing the jury not to consider the statement for its truth, but that, "while there is a presumption that a jury follows the [court's] instructions," admitting the statement would establish provocation, "an essential component" of the defense, "without

14

giving the People the opportunity to cross-examine or challenge the evidence at all."

The court ruled the probative value of the "untested, not subject to cross-examination statement . . . that the defendant saw the two victims having sex with each other . . . is outweighed by the undue prejudice of . . . the jury using it for the improper purpose of concluding that, in fact, he did see them having sex with each other, which is hearsay being offered for the truth of the matter asserted." The trial court ruled that Tzul could not introduce the note into evidence during the People's case or cross-examine the detective who found the note about it, but that Tzul could testify about the note if he chose to testify.

At the close of the People's case, counsel for Tzul made a motion for a mistrial "based on the court's . . . ruling regarding the note," stating his "client is only taking the stand because of that ruling." In denying the motion the court stated: "There is no question in this court's mind that [admitting the note] would be unduly prejudicial insofar as the jury would have considered it for the illegitimate purpose of proving the truth of the matter asserted without being tested."

> 2. *The Note's Probative Value Was Not Substantially Outweighed by a Probability of Creating a Substantial Danger of Undue Prejudice, Confusing the Issues, or Misleading the Jury*

Under section 352 "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the

jury."  Evidence "'"should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose."'"  (*People v. Alvarez*, *supra*, 18 Cal.5th at p. 462; see *People v. Johnson* (2022) 12 Cal.5th 544, 610.)

"Typically, the application of . . . section 352 to defense evidence does not infringe on a defendant's constitutional rights." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1063; see *People v. Cunningham* (2001) 25 Cal.4th 926, 998.)  "But the statute 'must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense." (*Sedillo*, at pp. 1063-1064; see *Cunningham*, at pp. 998-999; *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.)  We review the trial court's evidentiary rulings under section 352 for abuse of discretion. (*People v. Mataele* (2022) 13 Cal.5th 372, 413; *People v. Linton* (2013) 56 Cal.4th 1146, 1181.)

The note had significant probative value on two of the most important issues at trial: provocation and Tzul's mental state. "'The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state.'" (*People v. Nelson* (2016) 1 Cal.5th 513, 541; see *People v. Ward* (2005) 36 Cal.4th 186, 215.)  Provocation "may reduce murder from first degree to second degree." (*People v. Thomas* (2023) 14 Cal.5th 327, 384; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 328; see *People v.*

16

*Ocegueda* (2023) 92 Cal.App.5th 548, 557 [provocation can "reduce the murder to second degree if it precluded the defendant from deliberating or premeditating"].) A "subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000; see *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

Murder may be further "'reduced to voluntary manslaughter if the victim engaged in provocative conduct that would cause an ordinary person with an average disposition to act rashly or without due deliberation and reflection.'" (*People v. Enraca* (2012) 53 Cal.4th 735, 758-759; see *People v. Ocegueda, supra*, 92 Cal.App.5th at pp. 557-558 ["If the provocation that drove the defendant to passion also meets an objective criterion— if it is sufficient to cause a person of average disposition to act rashly and without deliberation—the defendant is deemed to have acted without malice and is guilty only of voluntary manslaughter."].) "'Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. . . . A heat of passion killing . . . is one caused by an unconsidered reaction to provocation rather than the result of rational thought." (*People v. Vargas* (2020) 9 Cal.5th 793, 828; see *People v. Thomas, supra*, 14 Cal.5th at p. 386.)

Tzul's statement "I found her having sex with her own brother and that fills me with rage" was relevant to show that he was provoked by finding Martha and Antonio having sex and that

he killed them in the heat of passion. If the jury found Tzul's emotional reaction precluded him from deliberating or premeditating, the jury could have convicted him of second degree murder rather than first degree murder in the killing of Martha. And if the jury found the provocation was reasonable—i.e., sufficient to cause a person of average disposition to act rashly and without deliberation—the jury could have convicted Tzul of voluntary manslaughter. (See *People v. Berry* (1976) 18 Cal.3d 509, 515 [evidence showed a "two-week period of provocatory conduct by [the defendant's] wife . . . that could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion"]; *People v. Le* (2007) 158 Cal.App.4th 516, 525 ["infidelity of a lover" is sufficient provocation for voluntary manslaughter]; see also *People v. Dominguez* (2021) 66 Cal.App.5th 163, 179-180 ["'anger or rage'" or "any intense emotion except revenge" can satisfy the subjective component of provocation].) Indeed, CALCRIM No. 570, which the trial court gave, lists as an example of heat-of-passion provocation "the infidelity of a lover."

Tzul did not deny he killed Martha and Antonio. The goal of Tzul's defense was to convince the jury he was guilty of voluntary manslaughter (or at worst second degree murder), not first degree murder. In closing argument counsel for Tzul argued that Tzul was provoked by the discovery Martha was cheating on him with her brother and that he killed Martha and Antonio in the heat of passion. Counsel told the jurors they were "here to determine the degree of the homicide" and asked them to return verdicts of "two voluntary manslaughters committed in the heat of passion." And aside from Tzul's testimony (which the court's

ruling forced him to give), his written statement—that he believed Martha and Antonio were having sex and that this filled him with rage—was the only evidence of provocation, the only real issue in the case.  (Cf. *People v. Wright* (1985) 39 Cal.3d 576, 583 [evidence the victim was under the influence of a narcotic had significant probative value, where the defendant's sole theory was "that he acted in self-defense in response to the victim's irrational behavior," and no other evidence "was presented to corroborate defendant's version of the incident"].)

The trial court recognized the note was probative on the issue of provocation, but expressed concern that, if the court admitted the note, the jury would "hear evidence of provocation without being subject to cross-examination, without being tested, without being in any way questioned.  And that would be all the evidence they would have on that issue."  The court concluded that, even if it instructed the jury not to consider Tzul's statement as evidence Martha and Antonio had sex, the jury would consider it for that improper purpose.

The trial court did not explain why the jury could not have followed an instruction the note was relevant to whether Tzul believed Martha and Antonio had sex, not to whether they in fact had sex.  "Jurors are generally presumed to follow instructions." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 752; see *People v. Ortiz* (1998) 38 Cal.App.4th 377, 395-396 (*Ortiz*) [the "jury is presumed to have followed the court's instructions" to consider the victim's statements only to show her state of mind, "not to prove whether the acts attributed to the [defendant] in the statement really happened"].)  As the Supreme Court stated in *People v. McCurdy* (2014) 59 Cal.4th 1063, "There is no possibility the jury considered evidence of defendant's

19

incestuous conduct as mere proof of propensity or bad character under Evidence Code section 1108:  Although the court initially ruled some evidence of defendant's incestuous conduct was admissible under this provision, it ultimately instructed the jury that evidence of other crimes was relevant only to prove motive or intent.  The court specifically instructed the jury the evidence of defendant's other crimes could not be considered as evidence of his bad character or propensity to commit the charged crimes.  We presume the jurors understood and followed the court's instruction." (*McCurdy*, at p. 1096.)  There is no reason not to presume the jury would have been able to follow an instruction to consider Tzul's statement he found Martha and Antonio having sex (and became enraged) as evidence only of Tzul's state of mind.

There are some circumstances where a statement is not circumstantial evidence of the declarant's state of mind unless the statement is true.  But this is not one of those circumstances.  As the court in *Ortiz, supra*, 38 Cal.App.4th 377 explained:  "For instance, if a declarant says:  'John has beaten me many times,'" the "jury can only legitimately conclude the declarant feared John if the statement is truthful." (*Id.* at p. 390.)  In contrast, if the statement "reflects a conclusion by the declarant which is manifestly unsupported by personal knowledge," for example, "'John keeps calling my house and hanging up when I answer,' . . . a jury could find the declarant honestly believed John had engaged in the conduct without necessarily finding that John had, in fact, done so." (*Ibid.*)[3]  The court in *Ortiz* concluded

---

[3]     Of course, Caller ID will now display the caller's "telephone number and other personal information, including the name" of

the victim's statement the defendant "had been breathing heavily outside her bathroom door while she was taking a shower but that when she opened the door to confront him he was gone" was "the type of statement that would be easiest for the jury to consider properly with a limiting instruction. No personal knowledge was asserted in the statement, and what the declarant believed is the critical feature of the statement as opposed to the accuracy of the information." (*Id.* at pp. 391, fn. 18 & 395.)

Like the victim in *Ortiz*, *supra*, 38 Cal.App.4th 377, Tzul could have been mistaken about what was happening on the other side of the bathroom door. But even if he was wrong, his statement was relevant to show what he believed he heard. (See *People v. Brooks* (1986) 185 Cal.App.3d 687, 694 ["hearing from bystanders that [the victim] murdered [the defendant's] brother" was adequate provocation for voluntary manslaughter because a "sudden disclosure" of a provocative event "may be the equivalent

---

the caller, on the recipient's phone. (*People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1139.) But before Caller ID, you could call a telephone number, wait for an answer, and hang up, without the person you called knowing who had called. (See Rinaldo, *Caller ID and Fair Credit Reporting: Technology and Traditional Notions of Privacy Clash* (1992) 16 Seton Hall Legis.J. 403, 413, fn. 42 ["before the advent of Caller ID . . . callers would identify themselves to the calling party when making a call"]; Felkowski, *Caller Identification Technology and the Challenges in Adapting to Telecommunications Innovations* (1991) 38 Wayne L.Rev. 415 ["the introduction of a telephone service named 'Caller Identification' (Caller ID) has brought about a vast change in the way the telephone is used, and abused," and "Caller ID has been hailed as the answer to, among other things, harassing and obscene telephone calls"].)

of the event itself, even if the disclosure is untrue"]; see also *People v. Lee* (1999) 20 Cal.4th 47, 59 [provocation sufficient to reduce murder to voluntary manslaughter must be "caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim"]; *People v. Le*, *supra*, 158 Cal.App.4th at p. 528 [same].)  Thus, there was no logical inconsistency in instructing the jury to consider Tzul's statement "I found her having sex with her own brother" as evidence of his state of mind, but not as evidence of whether the statement was true.

The People argue the note had minimal probative value because, without Tzul's testimony, there were "significant foundational questions," including who wrote the note and when. The People argue that, because "the note did not specify when the author found the victims having sex with each other in relation to the killings, it provided no basis for assessing how much time the author had in which to 'cool off' following the alleged discovery." (See *People v. Moye* (2009) 47 Cal.4th 537, 550 [""if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter"""].)  The note certainly did not conclusively establish Tzul killed in the heat of passion, and the prosecutor could have argued to the jury all the reasons the note was insufficient evidence of provocation.  But because the note was the only evidence of provocation, the cornerstone of Tzul's defense, it was highly probative for purposes of section 352. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1071 [trial court prejudicially erred in excluding under section 352 evidence third parties had threatened the defendant where, though the defendant's "claim of self-defense was not compelling," the

22

"excluded evidence was central to the defense"]; *People v. Wright,
supra*, 39 Cal.3d at pp. 583-584 ["that the evidence was not
conclusive" on whether the victim was under the influence of a
narcotic did not "negate its probative value to defendant's self-
defense claim"]; *People v. Basuta* (2001) 94 Cal.App.4th 370, 387-
388 [in the trial of a daycare operator accused of assaulting a
child who died from a rebleed of an earlier brain injury, the trial
court prejudicially erred in excluding under section 352 testimony
the child's "mother, when angry or frustrated, had jerked and
shaken the child," to support the defendant's "core defense" that
the child's mother, not the defendant, caused the earlier injury].)

      The People also argue evidence "the victims were involved
in an incestuous relationship was likely to mislead and inflame
the jury." True, "'incest has [ ] a rare power to disgust.'" (*United
States v. Thornhill* (9th Cir. 2019) 940 F.3d 1114, 1122.) But
even extremely disturbing and inflammatory evidence is
admissible if it is sufficiently probative. Indeed, courts admit
highly prejudicial evidence defendants charged with sex crimes
engaged in incest or viewed pornography. (See, e.g., *People v.
McCurdy*, *supra*, 59 Cal.4th at p. 1096 [trial court did not abuse
its discretion in admitting evidence of the defendant's incestuous
conduct with his sister and instructing the jury to consider the
evidence only to prove motive or intent and not as bad character
or propensity to commit the charged crimes]; *People v. Memro*
(1995) 11 Cal.4th 786, 864-865 [trial court did not abuse its
discretion in admitting material showing young boys in sexually
graphic poses that "would undoubtedly be disturbing to most
people" and instructing the jury "not to consider the items as
evidence that defendant was evil or was disposed to commit
certain types of crimes"]; *People v. Byers* (2021) 61 Cal.App.5th

23

447, 453-454 [trial court did not abuse its discretion in admitting evidence the defendant watched pornography before assaulting the victim, where the material was relevant to the defendant's motive and intent, the court admitted only the topics and not the titles, and the court gave a limiting instruction].)  The risk the jury will ignore a limiting instruction and use the evidence as proof of bad character or propensity to commit a crime is significantly less where the evidence impugns the character of a homicide victim, rather than a defendant whose guilt the jury must decide.

The People rely on *People v. Fontana* (2010) 49 Cal.4th 351, a case involving the rape shield law, which is not relevant here. In *Fontana* the defendant argued the trial court erred in excluding evidence the rape victim had engaged in sexual intercourse earlier that day.  (*Id.* at p. 368.)  The Supreme Court stated that the evidence had only slight probative value, but that the potential prejudice was substantial.  (*Id.* at pp. 369-370.) "For some jurors, the fact that the victim has engaged in sexual conduct outside of marriage automatically suggests a receptivity to the activity or is proof that the victim got what she deserved— neither of which is a rational or permissible inference." (*Id.* at p. 370; see § 1103, subd. (c)(1) ["evidence of specific instances of the complaining witness's sexual conduct . . . is not admissible by the defendant in order to prove consent by the complaining witness" in a prosecution for specified sex offenses].)  That impermissible inference—that a sexually promiscuous victim must have consented to sexual activity with the defendant—is not relevant in this case.

24

### 3. *The Error Was Not Harmless*

The People argue any error in excluding the note during the People's case was harmless because the trial court admitted the note during the defense case. Tzul argues the error was prejudicial because it "compelled [him] to give up his constitutional right not to testify" and because "his compelled testimony pushed jurors to convict him of murder." The People respond Tzul planned to testify even before the trial court ruled the note was not admissible during the People's case.

The record does reflect that, on the first day of trial, before jury selection, the trial court asked counsel for Tzul whether his client was going to testify, and counsel responded: "At this time I believe he will testify." But Tzul may well have changed his mind (as defendants are entitled to do) and decided not to testify had the court admitted the note into evidence during the People's case. Indeed, counsel for Tzul later stated that was the case: After the close of the People's case, counsel moved for a mistrial, stating Tzul was going to have to testify because the court excluded the note during the People's case.

Therefore, we consider whether, under the standard in *People v. Watson* (1956) 46 Cal.2d 818, it is reasonably probable Tzul would have obtained a more favorable result had the court admitted the note during the People's case and not required Tzul to testify to introduce the note into evidence. (See *People v. Brooks* (2017) 3 Cal.5th 1, 47 [applying *Watson* standard to evidentiary error]; *People v. Trujeque* (2015) 61 Cal.4th 227, 280 [section 352 error "is reviewed under the reasonable probability standard for prejudice" of *Watson*].) "A 'reasonable probability' 'does not mean more likely than not, but merely a *reasonable*

*chance*, more than an *abstract possibility*.'" (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329-330.)

We conclude there was a reasonable chance the jury would not have convicted Tzul of first degree murder or even second degree murder absent the error. First, as discussed, the note was the only evidence of provocation, which, if believed by the jury, could negate premeditation and deliberation for first degree murder or malice for murder. To be sure, the evidence of the air conditioner supported a finding Tzul acted deliberately and with premeditation. Had the court admitted the note without Tzul's testimony, however, there was a reasonable probability a juror could have concluded that Tzul asked for the air conditioner, not as part of a premeditated plan to commit murder, but (as his lawyer argued) because it was hot and a third person had been sleeping in the living room and that Tzul did not decide to use the air conditioner to keep the bodies cool until after he killed Martha and Antonio and decided to flee to Mexico. And Tzul's steps to flee and avoid capture did not, without more, support a finding of premeditation and deliberation. (See *People v. Anderson*, *supra*, 70 Cal.2d at p. 32 ["Evasive conduct shows fear: it cannot support the double inference that defendant planned to hide his crime at the time he committed it and that therefore defendant committed the crime with premeditation and deliberation."]; *People v. Wear* (2020) 44 Cal.App.5th 1007, 1031 [though evidence the defendant disposed of a gun and attempted to avoid arrest "may tend to show guilt . . . , we are not aware of any authority 'supporting the proposition that defendants tend to flee [or dispose of evidence] only when they have committed certain crimes but not others'"].)

26

Second, Tzul's testimony on cross-examination was quite damaging. The prosecutor, over counsel for Tzul's beyond-the-scope objection, elicited extensive evidence of planning that undermined Tzul's claim he killed on rash impulse rather than after thought and reflection. On cross-examination Tzul admitted that, prior to killing Martha, he (1) lied to Martha about going to his mother's house; (2) asked his brother to cover for him if Martha called; (3) moved his car so Martha would not see it; (4) hid under the bed; (5) muted his phone; and (6) took a knife from the kitchen and put it in his pocket. Tzul also testified that, after he killed Martha and Antonio, he took a bath, cleaned the knife, and put it in a drawer.

The People argue a trial court's evidentiary ruling may not "be deemed prejudicial" even "if it influenced a defendant's decision to testify." The People contend Tzul's argument to the contrary runs afoul of the rule stated in *Luce v. United States* (1984) 469 U.S. 38 and adopted in *People v. Collins* (1986) 42 Cal.3d 378, but that rule does not apply here. The *Luce* rule "requires that if a defendant wishes to preserve for appeal an objection to a trial court's *in limine* ruling permitting impeachment by a prior conviction, he or she must take the witness stand and actually suffer such impeachment." (*People v. Sims* (1993) 5 Cal.4th 405, 454; see *People v. Ayala* (2000) 23 Cal.4th 225, 272.) As the reasons for the *Luce* rule make clear, the rule does not apply where a defendant *does* testify. Those reasons are: (1) "the trial court, in order to balance the probative value of a conviction against its prejudicial effect, "'must know the precise nature of the defendant's testimony, which is unknowable when . . . the defendant does not testify,'"" and (2) "when the trial court errs in ruling the conviction

27

admissible, the reviewing court cannot intelligently weigh the prejudicial effect of that error unless the defendant has testified." (*Sims*, at pp. 454-455; see *Collins*, at p. 384.)  Those reasons, and the *Luce* rule, do not apply here:  Tzul testified, we can review his testimony, and we can evaluate the prejudicial effect of the trial court's ruling.

### 4.  *The Note Was Not Inadmissible Hearsay*

The People argue that, section 352 aside, the trial court properly excluded the note as hearsay to which the state-of-mind exception under section 1250 did not apply.  The People contend "the trial court reasonably found that [the] note was not admissible under Evidence Code section 1250 . . . during the prosecution case" because "the note did not contain an expression of [Tzul's] state of mind at the time he wrote the note."  Though the trial court did not make that ruling (the court ultimately excluded the note under section 352), the People made a hearsay objection in the trial court and argue on appeal their hearsay objection was valid.  (See *People v. Smithey* (1999) 20 Cal.4th 936, 971-972 ["'"'[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.'"'"]; *People v. Mani* (2022) 74 Cal.App.5th 343, 369, fn. 9 ["'We will affirm the trial court's evidentiary ruling if it is correct on any theory of law applicable to the case, even if for reasons different than those expressly stated by the trial court.'"]; see also *People v. Zapien* (1993) 4 Cal.4th 929, 976 ["'"'a ruling or decision, itself correct in law,

will not be disturbed on appeal merely because given for a wrong reason"'"'"].)

Tzul's note included two statements:  "I found her having sex with her own brother" and "that fills me with rage."  The first statement was not hearsay; the second was hearsay, but admissible under an exception to the hearsay rule.

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.'  [Citation.]  'Documents like letters, reports, and memoranda are often hearsay because they are prepared by a person outside the courtroom and are usually offered to prove the truth of the information they contain.'  [Citation.]  Hearsay evidence is generally inadmissible unless it satisfies a statutory exception." (*People v. Turner* (2020) 10 Cal.5th 786, 821.)

"In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay.  It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind." (*Ortiz*, *supra*, 38 Cal.App.4th at p. 389.)  "'A limiting instruction is required with declarations used as circumstantial evidence of the declarant's mental state; that is, the declaration is not received for the truth of the matter stated and can only be used for the limited purpose for which it is offered.'" (*People v. Cox* (2003) 30 Cal.4th 916, 963, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Tzul's statement "I found her having sex with her own brother" was not hearsay because he did not offer it to prove

29

Martha and Antonio were having sex (i.e., the truth), but as circumstantial evidence of Tzul's state of mind (i.e., Tzul believed Martha and Antonio were having sex). (See *Ortiz*, *supra*, 38 Cal.App.4th at pp. 385, 391 [victim's statement the defendant "entered the bathroom when she was showering" was "relevant circumstantial evidence of [the victim's] unwillingness to have consensual sex with" the defendant].) Because it was not hearsay, the trial court could not have excluded it on that ground.

Tzul's statement his discovery "fills me with rage" was hearsay because Tzul offered it for the truth; i.e., to prove he was "filled with rage." This hearsay statement, however, was admissible under section 1250, subdivision (a), which provides an exception to the hearsay rule for "out-of-court statements to prove the declarant's state of mind," where the declarant's state of mind "'is itself an issue in the action' or if the evidence 'is offered to prove or explain acts or conduct of the declarant.'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 814.)[4] This part of the note was a statement of Tzul's existing state of mind or emotion (rage) offered to prove his state of mind at a time when it was an issue in the action; specifically, whether he acted with premeditation or deliberation (first degree murder vs. second degree murder) or

---

[4]    Section 1250, subdivision (a), provides: "Subject to [s]ection 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

with malice (murder vs. manslaughter).[5]  (See *People v. Crew* (2003) 31 Cal.4th 822, 840 [murder victim's statement, "'If you don't hear from me in two weeks, send the police,'" was admissible under section 1250, subdivision (a), to rebut the defendant's claim the victim "disappeared of her own accord"]; *Ortiz, supra*, 38 Cal.App.4th at pp. 385, 391 [victim's statements she "was 'fed up' with [the defendant] living in her house were classic examples of section 1250's exception to the hearsay rule" offered to rebut the defendant's claim the victim "had invited him to her house on the day of the incident and willingly engaged in sex"].)

Thus, both statements were admissible, one as not hearsay and the other as hearsay but subject to an exception to the hearsay rule.  The trial court could not have excluded the note as hearsay.

The People also argue the note was inadmissible during the People's case because it was not sufficiently authenticated. Counsel for Tzul, however, could have authenticated the note by questioning the detective who found it.  (See § 1400 [a writing may be authenticated by "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is"]; § 1421 ["A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing."]; *People v. Wilson* (2021) 11 Cal.5th 259,

---

[5]     The statement was not, as the People argue, inadmissible "evidence of a statement of memory or belief to prove the fact remembered or believed."  (See § 1250, subd. (b).)

31

305 [content and location of documents law enforcement found in the defendant's residence supported authentication]; *People v. Goldsmith* (2014) 59 Cal.4th 258, 268 [authentication "may be supplied by other witness testimony, circumstantial evidence, content and location"]; *People v. Skiles* (2011) 51 Cal.4th 1178, 1187 ["a writing can be authenticated by circumstantial evidence and by its contents"].)  And there was little dispute it was the note Tzul wrote and left at the scene.

The People also argue that, because Tzul "wrote the self-serving note after killing two people as he prepared to flee to Mexico, the statement was undoubtedly made at a time when he had a motive to deceive and, therefore, failed to satisfy the trustworthiness requirement."  A trial court may exclude a statement otherwise admissible under section 1250 if it was "made under circumstances such as to indicate its lack of trustworthiness."  (§ 1252; see *People v. Harris* (2013) 57 Cal.4th 804, 844 ["statement is trustworthy within the meaning of section 1252 . . . when it is '"made in a natural manner, and not under circumstances of suspicion"'"]; *People v. Jurado* (2006) 38 Cal.4th 72, 130 [trial court did not abuse its discretion in excluding the defendant's "postarrest police interrogation, when he had a compelling motive to minimize his culpability for the murder and to play on the sympathies of his interrogators"].)[6]

---

[6]     The trial court could have excluded under section 1252 Tzul's statement he was filled with rage, but not his statement he found the victims having sex, which was admissible as circumstantial evidence of Tzul's state of mind, and not under the hearsay exception in section 1250.  (See *People v. Wilson* (2024) 16 Cal.5th 874, 929 ["trustworthiness inquiry" under section 1252 "is a limitation on hearsay evidence admitted under a state of

When Tzul wrote the note, he may have had some motive to minimize his culpability for killing Martha and Antonio, though not as strong a motive as a defendant who has been arrested and accused of a crime. Indeed, the cases cited by the People involved defendants attempting to minimize their culpability by making statements "during a postarrest police interrogation" (*People v. Jurado*, *supra*, 38 Cal.4th at p. 130) or in a postarrest police interview and a notebook written days after the murder (*People v. Edwards* (1991) 54 Cal.3d 787, 818- 820). Putting aside the unlikely possibility Tzul was, moments after killing Martha and Antonio, manufacturing evidence for a heat-of-passion voluntary manslaughter case to be used at his trial, the note was incriminating: It strongly suggested Tzul killed two people. The People have not shown the trial court should have excluded the note under section 1252 as untrustworthy; indeed, the court initially ruled the note was admissible under section 1250 (and hence sufficiently trustworthy). (Cf. *People v. Peoples* (2016) 62 Cal.4th 718, 758 [trial court could reasonably conclude the defendant's statements of remorse to his family and to pastors "made after defendant's attorneys had begun to work on his defense" were unreliable under section 1252]; *People v. Livaditis* (1992) 2 Cal.4th 759, 780 [while the defendant "was in jail awaiting trial he certainly had a motive to claim remorse," and his "sincerity in telling potential defense witnesses he was sorry was suspect"]; *People v. Whitt* (1990) 51 Cal.3d 620, 643 ["there was ample ground to suspect defendant's motives and sincerity"

---

mind exception [citations]; it does not apply to evidence that is not hearsay"].)

during a prison interview conducted while his appeal was pending].)

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate Tzul's convictions and set the matter for a new trial.

SEGAL, J.

We concur:

MARTINEZ, P. J.

GIZA, J.*

---

*    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.